**In the Matter of Robert SELDEN and Linda Selden, Debtors.**

**Bankruptcy No. BK84–2414.**

United States Bankruptcy Court, D. Nebraska.

Jan. 27, 1986.

John Minahan and Randall Wright, Attys., Omaha, Neb., for FDIC.

Steven Wolf and Norman Westergren, Attys., Omaha, Neb., for debtors.

## MEMORANDUM OPINION RE MOTION FOR RELIEF FROM AUTOMATIC STAY FILED BY FEDERAL DEPOSIT INSURANCE CORPORATION

TIMOTHY J. MAHONEY, Bankruptcy Judge.

Final evidentiary hearing on Motion for Relief from Automatic Stay filed by the

Federal Deposit Insurance Corporation was heard on November 7, 1985. John Minahan and Randall Wright of Dixon, Dixon & Minahan, P.C., Omaha, Nebraska, appeared on behalf of the Federal Deposit Insurance Corporation. Steven Wolf and Norman Westergren of Westergren, Hauptman, O'Brien & Wolf, P.C., Omaha, Nebraska, appeared on behalf of the debtors.

At the close of all of the evidence, both parties requested the opportunity to prepare and file post-trial briefs concerning several of the issues that had been raised during trial. Leave was granted to file such briefs and both parties took the opportunity to provide the Court with voluminous legal arguments and authority for their positions. This opinion is written following a complete review of the evidence received at trial and the trial brief and post-trial briefs filed by the parties, as well as the arguments presented at the close of all of the evidence.

### Memorandum Opinion

The debtors are residents of Howard County, Nebraska, engaged in the dairy farming business. They own some land, improvements, dairy equipment, dairy cows and the crops they grow on the land are used mainly for feeding of the dairy cows. Their income is obtained from the sale of milk. In December of 1984 they filed for protection under the Bankruptcy Code pursuant to Chapter 11 and have continued to operate the dairy business since the filing of the petition for relief.

The Federal Deposit Insurance Corporation (FDIC) was named receiver of the State Bank of Dannenbrog (the "Bank") on or about January 7, 1985. The Bank was the primary operating lender to the debtors and on August 16, 1985, the FDIC as receiver of the Bank pursuant to 12 U.S.C. § 1821(e) filed the Motion for Relief from the Automatic Stay.

The FDIC alleges that it is the holder of a secured claim against the debtors in the principal amount of approximately $135,000 plus accrued interest and that the value of the collateral as shown on the schedules filed by the debtors is approximately $120,-000. The FDIC alleges that its interest in the collateral is not adequately protected because of the fact that the collateral is declining in value through age, use and obsolescence and it further alleges that the relief should be granted because the debtors have used cash proceeds from the sale of milk products and used other cash collateral without the consent of the FDIC and in violation of § 363 of the Bankruptcy Code. Therefore, according to the FDIC, such violations amount to cause under § 362(d)(1) and relief should be granted. Finally, the FDIC alleges that the debtors have no equity in the collateral and the collateral is not necessary to an effective reorganization.

The debtors respond to the allegations of FDIC and their responses are the basis for the issues which must be determined by this Court.

First, the debtors claim that if the FDIC has a valid perfected security interest at all, it is only perfected as to the ownership interest of Mr. Selden and that Mrs. Selden owns at least a one-half interest in all of the property. Since she has such an ownership interest and since the Bank did not obtain her signature on a financing statement, the security interest of the Bank is limited to the value of Mr. Selden's one-half interest in the property.

Second, the debtors allege that even if the Bank had a perfected security interest in the equipment, livestock, feed and proceeds, the Bank had waived such security interest by permitting the debtors to sell the collateral in the ordinary course of business over the years and, therefore, the FDIC has no right to step in post petition and reassert the security interest.

Third, the debtors allege that even if the FDIC has a valid perfected security interest in the equipment, cows, feed, grain and the proceeds thereof, it does not and never did have a perfected security interest in the milk because the Bank failed to check the appropriate portion of the financing statement which indicated that the Bank claimed

a security interest in products of the collateral.

Finally, the debtors allege that since the Bank and, therefore, the FDIC do not have a validly perfected security interest in the collateral, the FDIC cannot complain as to the use the debtors made of the proceeds of the collateral. In addition, the debtors claim that they should be forgiven for using the collateral and paying certain professionals without Court approval because they are innocent of knowledge of the bankruptcy laws and were advised by counsel with regard to such payments.

The FDIC responds that it is immune from the state law waiver defenses.

## Issues

1. Does Mrs. Selden have an ownership interest in the property sufficient to defeat a security interest granted in the property by her husband? *Answer:* No.

2. Did the Bank waive its perfected security interest in the collateral by permitting the sale of the collateral without its specific permission? *Answer:* Yes.

3. Is the FDIC subject to the state law defense of waiver of a validly perfected security interest? *Answer:* Yes.

4. Did the Bank have a validly perfected security interest in the milk products? *Answer:* Yes.

5. Do debtors have equity in the collateral? *Answer:* No.

6. Is the collateral necessary for an effective reorganization? *Answer:* Yes.

7. Do debtors' activities in violation of the Bankruptcy Code amount to "cause" sufficient to enable FDIC to obtain relief? *Answer:* No.

## Decision

The Bank has a validly perfected security interest in the milk products and in the grain and feed and the livestock but such interest was waived as to the collateral which was sold. The FDIC as receiver is subject to the waiver defense. The sale of the livestock was in the ordinary course of

business and the use of the grain to feed the livestock was in the ordinary course of business and the sale of the milk product was in the ordinary course of business. The payment of professional fees to consultants and to attorneys is a violation of the Bankruptcy Code but is not cause for granting relief from the automatic stay. The FDIC retains a security interest in all collateral remaining in possession of debtors, proceeds of sale of livestock, and proceeds of milk sales now in possession of FDIC. When FDIC took affirmative action to obtain milk proceeds and when it filed for relief from stay, waiver of its rights to prohibit sale of collateral terminated.

## Findings of Fact

The Seldens operate a dairy farm and from mid 1980 until its closing on or about January 7, 1985, the Seldens used the State Bank of Dannenbrog as their main operating lender.

The State Bank of Dannenbrog loaned money to the Seldens at various times over the years and the total outstanding on the date the petition was filed was approximately $135,000. Some of the notes were signed only by Robert Selden and some were signed by both Robert and Linda Selden.

To secure the notes the Bank obtained a signed security agreement from Robert Selden and a signed financing statement from Robert Selden. The financing statement upon which the Bank and the FDIC rely for perfection of the security interest is dated April 16, 1980, and filed in the appropriate county officer records. That financing statement is signed only by Mr. Selden and it covers the following types of property:

All farm products including livestock, crops, and supplies or produced in farming and feeding and milking operation, products of livestock and all equipment and all machinery, contract rights and accounts now owned or hereafter acquired.

On July 10, 1984, Robert and Linda Selden borrowed $130,137.63. The note states

that the purpose of the credit is note renewal and that it is secured by a security agreement dated July 10, 1984. The note was due on January 6, 1985.

To secure the debt Mr. and Mrs. Selden both signed a security agreement which was quite detailed in the description of collateral. The description was:

All farm products or inventory, including but not limited to all livestock, crops, grain, hay, seed, feed, fertilizer, supplies and products of crops and of livestock: together with all equipment including but not limited to all farm machinery and equipment, tractors, non-titled vehicles, machinery, implements, tools, irrigation systems, including but not limited to power units, wells, gearheads, pumps and alternators, dairying systems, all goods owned or used for preparing land or for planting, cultivating, fertilizing, irrigation, harvesting, moving, drying, storing, marketing or processing of crops, products of crops, grain, seed or feed or for raising, feeding, handling, breeding, marketing or caring for livestock, all accounts accounts and general intangibles, and debtor's interest in any minerals, including oil and gas. Such security interest shall cover warehouse receipts or other documents of title which evidence storage or position of crops or products of crops, livestock or products of livestock, or inventory, all of the above located at the NW ¼ of Section 31—Township 13, Range 11 West of the 6th. P.M. Howard County, Nebraska and the S ½ of the SW ¼ of Section 32, Township 13, Range 11 West of the 6th. P.M. Howard County, Nebraska.
113 Head of Holstein Milk Cows
24 Head of Bred Heifers and Dry
24 Head of Heifers
25 Head of Mixed Calves 1984 Calves
24 Head of Heifers year old
18 Head of Open Heifers
1 Holstein Steer
1 Herford Bull
1 Buffalo
6,000 Bu. Corn at $3.10
210 Ton Alfalfa at $45.00

all Dairy equipment and machinery nor owned or hereafter acquired
303 Acres of Irrigated Corn with projected yield of 110 Bu. Per Acre for $99,-990.00
12 Acres of Irrigated Beans

No financing statement was signed at the time the security agreement was signed on July 10, 1984. Therefore, the only financing statement is the 1980 financing statement signed by Mr. Selden alone.

From the beginning of the business relationship between Mr. Selden and the Bank, and continuing after the execution of the security agreement in July of 1984, Mr. Selden operated his dairy business without regard to the strict requirements of the security agreement. The security agreement prohibited the disposition of any of the collateral. There is no language in the security agreement which permits the sale of milk or permits the debtor to use any of the collateral to feed the livestock. There is language that a waiver of any of its terms does not prohibit later enforcement of those terms.

Mr. Selden testified that he used the collateral to feed the livestock; he sold livestock and replaced dairy cows as needed; he sold all of the milk. He did not receive specific permission from the Bank to do any of the above. However, the Bank was aware that he did feed the livestock with collateral, did trade livestock and did sell milk.

The Bank, at no time, required written permission of the Bank prior to such use or sale of collateral and the Bank at no time required the debtor to apply the proceeds of the sale of milk to the debt.

Mr. Selden testified that his practice was to make an annual or semi-annual payment to the Bank on the notes and to use the proceeds from the sale of milk for the necessary expenses of operation of the dairy farm, including the purchase of supplies for planting and maintaining and harvesting the crop and for living expenses.

No contrary evidence was presented by the FDIC.

The business practice of the Bank and Mr. Selden was absolutely opposite the written requirements of the security agreement. Therefore, the Court finds as a fact that the Bank consented to the use and sale of the collateral, including the use of the grain and hay for feed, the sale of dairy cows which either were not producing or were not necessary for the maintenance of the herd, and the sale of milk.

From 1980 until the date the bankruptcy petition was filed the Bank treated Robert Selden as the owner of all of the personal property which was used as collateral for the loans. Robert Selden borrowed money from the Bank, signed notes, security agreements and a financing statement without informing the Bank that he believed that his wife had an ownership interest in the personal property. Instead, he purported to grant a security interest in all of the personal property used in the farming operation.

Mr. Selden was the sole owner of the livestock brand issued by the State of Nebraska Brand Committee, which brand was used by Mr. Selden to mark for identification purposes all of the livestock which the Bank claims as collateral for its loans.

Mr. and Mrs. Selden did not have either a written or oral agreement concerning the ownership of the non-titled personal property which was used as collateral for the bank loans. At the time of filing bankruptcy and at the time of the hearing Mr. and Mrs. Selden either believed or were informed by their attorney that simply by virtue of their marriage and the fact that Mrs. Selden worked on the farm created an ownership interest in the personal property in her. However, the evidence is that there was no agreement between the parties and that the matter had never been discussed. Although all other titled property held by the parties was held in joint tenancy or tenancy in common, there is no evidence that Mrs. Selden has an ownership interest in the non-titled personal property by virtue of an agreement. All of the evidence is to the contrary. The brand is in Mr. Selden's name. The financial obligations from 1980 through early July of 1984 were in his name. The security agreement and the financing statement up until July of 1984 were signed by him alone. Although she occasionally accompanied him to the Bank and was aware that he was borrowing money and granting some type of a security interest in the non-titled personal property, she made no effort to inform the Bank or to inform Mr. Selden that she believed she had a property interest in the non-titled personal property.

After the bankruptcy petition was filed, the debtors continued to sell the milk, use collateral to feed the livestock, use the proceeds of the sale of the milk to pay ordinary and necessary expenses of the dairy operation, including the payment of property taxes, payment of suppliers concerning the planting and harvesting of the crop, payment of ordinary living expenses and payment of principal and interest on a vehicle secured by another creditor. In addition, the debtors sold 19 head of livestock and purchased 14 head as replacement. On the date the hearing was held, the debtors held in their possession approximately $3,700 representing a portion of the proceeds of the sale of the livestock which the debtors intended to use to purchase additional replacement livestock. The debtors also, during the administration of the estate, continued to feed the livestock with grain and hay claimed by the Bank and the FDIC as collateral.

The debtors paid two different "management consultants" a total of approximately $1,800 after the filing of the bankruptcy petition and without court authority. Finally, debtors paid their attorney $3,000 without court authority and the attorney filed a statement of compensation as required by the rules which indicated that he had received only $1,000. Such statement was not filed until the day of hearing. At the hearing the attorney made a professional statement that the funds paid to him by the debtors were held in his trust ac-

count pending appropriate authority from the Court.

### Conclusions of Law

#### I.  Mrs. Selden's Ownership

The burden is upon Mrs. Selden to show and prove her interest in the property by the preponderance of the evidence.  *In the Matter of the Estate of Whiteside*, 159 Neb. 362, 67 N.W.2d 141 at 146 (1954). Also, the Nebraska Supreme Court in the case of *Peterson v. Massey*, 155 Neb. 829, 53 N.W.2d 912 at 916 (1952) states that the burden of establishing the existence of either a joint enterprise or a partnership is upon the party asserting the relationship exists.

There is no competent evidence in this case to support the position of Mrs. Selden that she had an ownership interest in the non-titled personal property.  The Nebraska brand for the livestock is in the name of Mr. Selden.  The Nebraska Brand Statute R.R.S. 54–109 provides that a certified copy of the brand document shall be *prima facie* evidence of the ownership of the livestock.  Debtors argue that such *prima facie* evidence may be rebutted, and this court accepts such argument, but no such rebuttal evidence was provided.

Debtors argue that the Memorandum Opinion issued by the United States District Court for the District of Nebraska, *In the Matter of Orville E. Hansen*, 60 B.R. 359 (D.Neb.1982), is the most recent interpretation of Nebraska law with regard to the co-ownership interest of a spouse and that such case somehow binds this Court to determine that the marital relationship itself creates such a co-ownership interest. This Court does not accept that argument. In the opinion Judge Beam cites *In re Whiteside's Estate, supra*, for the position that the form of ownership in which property is taken depends to a substantial extent on the intent of the parties.  The intent of the parties is determined by a factual inquiry and, as stated above, it is the burden of the claimant to prove the intent of the parties

concerning all elements of the claimant's ownership interest.

Mr. Selden sold the milk and the milk checks were made in his name.  Mr. Selden sold the cattle and the cattle checks were made in his name.  Mr. Selden purchased cattle and the documentary evidence of ownership shows ownership in his name. Mr. Selden owned the brand.  Mr. Selden signed the original notes, security agreement and financing statement.  A portion of the deposition of Mrs. Selden was presented.  She stated that she believed she had an ownership interest because she worked on the farm and because she was married to Mr. Selden.  Mrs. Selden did not testify at trial and Mr. Selden did not testify that there was any express agreement between Mr. and Mrs. Selden concerning the ownership of the non-titled personal property.

It is the conclusion of this Court that she does not have an ownership interest in the property.

#### II.  Waiver of Security Interest

The second issue concerns the possibility of a waiver of its rights under the security agreement by the Bank prior to the intervention of the FDIC.  The debtors claim that the Bank waived its security interest in all of those items of collateral which the debtors sold prior to and after filing bankruptcy and that as a result of the waiver, the Bank and its successor, the FDIC, cannot obtain relief for cause.  In other words, the debtors claim that as a result of the practice between the Bank and the debtors, the debtors had a right to sell collateral and use the proceeds for the operation of the business.  They did use and sell the collateral and use the proceeds in the operation of the business and the FDIC has no right to obtain relief from the stay because they did so.

The Nebraska Supreme Court definition of "waiver" is found in *Lipe v. World Insurance Co.*, 142 Neb. 22, 27, 5 N.W.2d 95, 98 (1942):

" 'Waiver' has been defined as a voluntary and intentional relinquishment or abandonment of a known existing legal right, advantage, benefit, claim, or privilege, which except for such waiver the party would have enjoyed; the voluntary abandonment or surrender, by a capable person, of a right known by him to exist, with the intent that such right shall be surrendered and such person forever deprived of its benefit; or such conduct as warrants an inference of the relinquishment of such right; or the intentional doing of an act inconsistent with claiming it."

In *State Bank, Palmer v. Scoular-Bishop Grain Co.*, 217 Neb. 379, 349 N.W.2d 912 (1984) the Nebraska Supreme Court analyzed the previous cases in which the waiver of a security interest had been argued and concluded that the bank could waive its interest by its practices.

The Nebraska Supreme Court in *Scoular-Bishop, supra*, directed that the standard of proof to be applied by the trial court to the waiver argument is by clear and convincing evidence, being that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *Id.* at 917.

Nebraska U.C.C. § 9–306(2) (Reissue 1980) states:

"Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor".

The possibility of a waiver of the security interest is derived from the "or otherwise" language of § 9–306(2). In *Central Cal. Equip. Co. v. Dolk Tractor Co., supra*, the California court when interpreting the California equivalent of Nebraska U.C.C. § 9–306(2) stated:

"While we interpret 'or otherwise' to permit an implied agreement, we believe that such an implied agreement should

be found with extreme hesitancy and should generally be limited to the situation of a prior course of dealing with the debtor permitting disposition. The issue is a question of fact, but the trial court should carefully consider the written prohibition against disposition found in the security agreement as an important factor in the factual determination and should determine the matter in favor of the written prohibition unless such conclusion is unreasonable under the circumstances". *Id.* 78 Cal.App.3d 855, at 862, 144 Cal.Rptr. 367 at 371.

The facts are clear. The security agreement prohibits the sale of collateral. The actual practice was for almost daily sale of milk, the daily use of grain and hay as feed for the livestock, the regular sale and purchase of livestock and replacement livestock, the use of the cash proceeds for the general operations of the farm. The Bank did not attempt to enforce its security interest and did not direct the debtors to terminate their practices. From the evidence it is apparent that such literal interpretation and enforcement of the security agreement would have prohibited the operation of the farm and the dairy business. If the Bank would have really prohibited the use of the grain and hay, the cows would have starved. There then would have been no milk. If the Bank would have prohibited the sale of livestock and the repurchase of replacement livestock, eventually the herd would have been unable to provide milk. If the Bank had prohibited the sale of milk, there would have been no receipts for the operation of the business or the potential repayment of the bank debt. If the Bank would have prohibited the use of the proceeds from the sale of the milk, there would have been no crop planted or harvested, no grain or hay to feed the livestock, no milk to sell, no food or housing or utilities for the Seldens, no business.

This Court must conclude that the Bank did not intend to enforce its rights under the security agreement either as to third parties or as to the debtors themselves.

The loans were made to an operating business and the operating business was authorized to use the collateral in the hopes of producing a profit which would pay back the loans.

The FDIC argues that the *Scoular-Bishop* case and others like it are not applicable because in each of those cases the court was interpreting the rights of the secured creditor as against a third party purchaser of secured collateral. In contrast, in the Selden case the Court is required to interpret the rights of the secured creditor as against the debtor who granted the security interest in the property. Such reasoning does not help the FDIC. In *Scoular-Bishop* and in each of the cases interpreted by it, the emphasis of the court was to inquire into the relationship between the debtor and the creditor to determine whether or not a waiver had occurred. It is true that in each of those cases the third-party purchaser of secured collateral was the beneficiary of the waiver because the third party, if the waiver was sustained, was not required to pay for the collateral twice. However, the question before this Court is "Did the secured party waive its right to enforce its security interest as to collateral which was used and sold by the debtor?" This Court concludes that the prior course of dealing between the Bank and the debtors permitted the debtors to dispose of the collateral notwithstanding the written prohibition in the security agreement.

In the bankruptcy context this means that each of the sales and each of the uses of collateral and each of the uses of proceeds of the sales of such collateral which were in the ordinary course of business are legal and are permitted and cannot be used as "cause" to grant the FDIC relief from the automatic stay.

Several questions still require answers. First, is the FDIC subject to the waiver defense? Second, does the FDIC have a right to reassert the use and sale prohibitions in the security agreement, if such waiver does apply to the FDIC? Third, does the payment for professional services of management consultants and lawyers without court approval amount to "cause" which should result in relief being granted? Fourth, does the FDIC have a perfected security interest in any collateral at this time, and, if so, what is the extent of that security interest?

### III. FDIC Defenses
#### a) Section 363

The FDIC, in addition to arguing that *Scoular-Bishop* does not apply, urges two reasons why the waiver theory is not applicable to the FDIC. The first is that even if there was a waiver of the security interest prior to the bankruptcy petition being filed, once the bankruptcy petition is filed then § 363 of the Bankruptcy Code comes into effect and the prohibition on the use of cash collateral without consent of the creditor would be applicable. The FDIC further argues that the grain, hay, livestock and milk products are cash collateral pursuant to the definition in § 363(a) and so the debtor-in-possession is prohibited from using cash collateral without first obtaining permission of the creditor or the Court pursuant to § 363(c).

■ The problem with that argument is that the state law security interest in the grain, hay, livestock and milk proceeds was waived. Such waiver means that the creditor does not have an interest in the "collateral" and since the creditor does not have such an interest, the "collateral" is not cash collateral pursuant to the definition of § 363(a) of the Bankruptcy Code. Since the "collateral" is not "cash collateral" pursuant to the Bankruptcy Code as long as the waiver is in effect, the debtor does not need permission of the creditor, because the creditor has no interest in the property and does not need permission of the Court because the property is not cash collateral and because § 363(c)(1) provides that the trustee (or debtor-in-possession) may, in the ordinary course of business, without notice or a hearing use the property and sell the property.

The agreement provides that even if any provisions of the agreement are waived, such waiver does not preclude the Bank

from thereafter enforcing any provision previously waived. Therefore, although the Bank has waived its security interest in certain collateral, it or its successor, the FDIC acting as receiver, may reassert the creditor's rights under the agreement at any time.

The debtors argue that such a waiver means that the Bank's security interest was not perfected on the date the bankruptcy was filed and, therefore, the debtor-in-possession, holding the rights of a trustee, may exercise the "strong-arm powers" of § 544 of the Bankruptcy Code and put the Bank's interest permanently behind the interest of the debtor-in-possession. Such an interpretation of the Uniform Commercial Code and the Bankruptcy Code would enable the debtor to permanently eliminate the claimed lien of the Bank in all or most of the collateral.

■ This court finds that the waiver of the right of the Bank to enforce its security interest in collateral does not make the Bank unperfected. There was a valid filed financing statement on file on the date the Seldens declared bankruptcy. Therefore, the Bank's interest in the collateral was perfected. However, the Bank, through its practices, had waived its rights to prohibit the sale or use of that collateral and until it reasserted its rights by some affirmative act, it had no interest in the property which would require the debtor-in-possession to obtain court approval for its sale or use under § 363 of the Bankruptcy Code.

■ The financing statement was very specific as to the collateral, which was covered, which included products of the livestock and, therefore, the milk product and the proceeds thereof were adequately identified and the Bank did perfect a security interest in the milk product, which it then promptly waived.

### b) Immunity from State Law Claims

The next argument of the FDIC is that federal law prohibits the application of a state law defense to the FDIC's claim to an interest in the collateral. The argument of the FDIC is as follows: it is important that the FDIC be able to rely on the books and records of banks when conducting ongoing examinations, to have resort to national uniformity, without radical variations resulting from varying state laws, in its legal ability to overcome borrower defenses to collection of debts; and to be able to evaluate quickly from the records of a closed bank, the potential loss to the deposit insurance fund that could result from the closing and to select the method of closing that minimizes that loss. Based upon that general policy theory, the FDIC claims that Congress recognized those special considerations and passed a specific statute to protect the FDIC from defenses which a debtor may have had against the failed bank. That statute is 12 U.S.C. § 1823(e) which reads:

> No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

In addition to the statute, the FDIC cites the United States Supreme Court case of *D'Oench, Duhme & Co., v. Federal Deposit Insurance Corporation*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). The supplemental brief of the FDIC, at page 9 states:

> "Broadly stated, the rule of *D'Oench, Duhme* is that a person who joins with a bank in creating paper that gives the appearance of an asset will not be heard to complain that the paper is unenforceable because of some arrangement with

the bank which the person 'lent himself to' that had the result of rendering the paper invalid. The classic example is the person who gives a note to the bank with the understanding that it will not be called for payment."

Further, on page 9 of the brief, the FDIC alleges that the facts in the Selden case are analogous to those in *FDIC v. Alker*, 151 F.2d 907 (3rd Cir.1945). The FDIC states:

In that case the debtor alleged that an oral agreement existed between himself and the bank that if additional collateral were put up to secure a loan, the bank would not call the loan or disturb the collateral until the collateral's value had risen so the debtor could recover his equity. Since that agreement was not apparent from bank records, the court, following *D'Oench, Duhme*, held it was unenforceable.

In the Selden case there is no oral or written agreement between the bank and the debtor which would tend to diminish or defeat the right, title or interest of the Corporation. There is an ongoing practice by the Bank and the debtor whereby the Bank's security interest was waived pursuant to state law.

■ Contrary to the position asserted by the FDIC, 12 U.S.C. § 1823 does not apply to this case. That section deals with the FDIC in its corporate capacity, not in its capacity as receiver of a state bank. The whole scheme of the various subsections of § 1823 clearly deal with the FDIC in its corporate capacity and not in its capacity as receiver.

Another section, 12 U.S.C. § 1821(e), specifically details the power and authority of the FDIC as receiver of state banks and is the section the FDIC mentions in its motion as its authority for filing the motion. This section says:

"... With respect to any such insured State bank or insured branch of a foreign bank, the Corporation as such receiver shall possess all the rights, powers and

privileges granted by State law to a receiver of a State bank."

■ It seems to this Court that if the FDIC as receiver of a State bank possesses the rights, powers and privileges granted by State law to a receiver of a State bank, then it is also subject to the State law defenses that a non-FDIC receiver of a State bank would be subject to. See *FDIC v. Leach*, 525 F.Supp. 1379 (E.D.Mich., S.D. 1981). *FDIC v. Ashley*, 585 F.2d 157, 161 (6th Cir.1978).

The *D'Oench, Duhme* case, relied upon by the FDIC does not help the FDIC in this case. In *D'Oench, Duhme*, an individual had executed a note and delivered it to a bank which eventually failed. The note was renewed on several different occasions and the receipts for the notes contained the statement "This note is given with the understanding it will not be called for payment. All interest payments to be repaid." The FDIC had no knowledge of the existence of the receipts until after it made demand for payment on the renewal note following the failure of the bank. The question for the Court was whether State law applied to the determination of liability of the maker of the note or whether some federal common law applied which would require the payment of the note.

Justice Douglas reviewed the language of § 12b(s) of the Federal Reserve Act, 12 U.S.C. § 264(s) and found that the provisions of the Act revealed a federal policy to protect the insuring government agency and to protect the public funds which it administers against misrepresentations as to the securities or other assets in the portfolios of the banks which the agency insures or to which it makes loans. 315 U.S. at 457, 62 S.Ct. at 679. He then went on for several pages to discuss the federal policy and the types of situations in which debtors and/or bank officers engaged in some type of practice which permitted the records of the bank to show assets that really were not owned by the bank. He found an important federal policy to pro-

tect the agency from such misrepresentations, misstatements as to the genuineness or integrity of securities in the portfolios of banks and therefore found that federal law should apply. His opinion, therefore, precluded the maker of the note from arguing the State law defense of lack of consideration. *Id.* at 461, 62 S.Ct. at 681.

Justice Jackson in a lengthy concurring opinion attempted to define those areas of banking law in which State law might apply because it did not interfere with the general federal policy. He states at 315 U.S. 474, 62 S.Ct. 687:

"No doubt many questions as to the liability of parties to commercial paper which comes into the hands of the Corporation will best be solved by applying the local law with reference to which the makers and the insured bank presumably contracted. The Corporation would succeed only to the rights which the bank itself acquired where ordinary and good faith commercial transactions are involved."

■ The Selden case involves ordinary commercial transactions pursuant to State law. It does not involve misrepresentation by the debtors or by bank officers concerning the validity of securities and it does not concern oral or written agreements between the debtors and the bank which could mislead the FDIC in making its necessary evaluations of the capital structure and assets of a State bank: It concerns only ordinary commercial transactions and the State law provisions that permit a security interest of a creditor to be waived through practice and procedure, rather than agreement or misrepresentation. There is no federal statute nor is there any federal policy which should intervene to grant the FDIC as receiver of a State bank rights superior to those that the State bank itself would have had if it had survived to participate in the Selden bankruptcy case. Therefore, the claim of the FDIC that it is not subject to the "waiver" defense of the Seldens is not accepted.

## IV. Reassertion of Interest in Collateral

■ Pursuant to the terms of the security agreement the FDIC reasserted its rights to enforce the terms of the security agreement when it took affirmative action to take possession of the milk checks and notified the debtors that sale of the milk and use of the proceeds from such sale was not consented to by the FDIC. The FDIC has possession of certain checks representing milk proceeds. The security interest of the FDIC did attach to such proceeds and those proceeds are cash collateral pursuant to the definition of § 363 of the Bankruptcy Code. The FDIC reasserted its right to enforce the terms of the security agreement concerning the livestock when it filed its motion for relief from stay in August of 1985. Therefore, the proceeds of the sale of livestock, which sale took place in September of 1985, are subject to the security interests of the FDIC and are cash collateral.

If any of the hay and grain which was on hand on the date that the bankruptcy petition was filed was still in existence on August 10, 1985, the date of the filing of the motion for the relief from the automatic stay, the grain and hay are also subject to the security interests of the FDIC and are cash collateral pursuant to § 363. The debtors have the legal obligation pursuant to § 363 to obtain the consent of the secured creditor or to obtain the consent of the Court before further using or selling any cash collateral.

## V. Cause

■ Payment of the management consultants and payment of the lawyers from property of the estate without court approval is a violation of 11 U.S.C. §§ 327, 328 and §§ 330, 331. In addition, debtors' attorneys failed to comply with 11 U.S.C. § 329 regarding disclosure of compensation. This Court has previously found that violation of the Bankruptcy Code can be "cause" under § 362(d)(1) thereby giving the Court power to grant relief from the automatic stay. See unpublished opinion filed January 3, 1986, in *McMartin Indus-*

*tries, Inc.*, BK85–1190. See also *In re W.H.I., Inc.*, 10 B.C.D. 536, 28 B.R. 389 (D.S.D.1983). In this case, however, the debtors have been represented by counsel at every stage of the administration of the estate. They have followed the directions of counsel and have made payments to the management consultants and to the attorneys as a result of advice given them by counsel. To grant relief from the stay under these circumstances would be unfair to the debtors in possession. The appropriate penalty should be meted out to the attorneys and to the management consultants who were paid without court authority. In addition, if the debtor-in-possession has paid pre-petition debts as alleged by the creditor, and has done so on the advice of counsel, such payments may be brought back into the estate under the appropriate circumstances. This Court will not lay the blame on the debtors-in-possession who, in good faith, employed the services of knowledgeable bankruptcy attorneys and followed their advice. Even though such advice seems to be inappropriate and erroneous, these debtors under these circumstances, shall not be punished for following it.

### VI. Equity Necessary for Effective Reorganization and Adequate Protection

Debtors have no equity in the collateral. It is necessary to an effective reorganization. The creditor was undersecured on the date the petition was filed, but the only evidence of further decline in value of the collateral concerns use and sale which were impliedly authorized. Creditor, therefore, has no right to relief on the grounds of lack of adequate protection.

The stipulation between the parties concerning the sale of milk and the use of the proceeds shall remain in effect until a hearing is held at the request of either party on the use of cash collateral. Such hearing shall be provided by the Clerk's office.

Relief denied.