STATE BANK, PALMER, NEBRASKA, A NEBRASKA
BANKING CORPORATION, APPELLEE, V. SCOULAR-BISHOP
GRAIN CO., A NEBRASKA CORPORATION, APPELLANT.

349 N.W.2d 912

Filed May 18, 1984. No. 83-034.

Edward D. Hotz of Hotz, Kizer & Jahn, P.C., for
appellant.

Steven M. Curry of Sampson, Curry & Hummel, for appellee.

Krivosha, C.J., Caporale, and Grant, JJ., and Camp, D.J., and Colwell, D.J., Retired.

Colwell, D.J., Retired.

Plaintiff, State Bank, Palmer, Nebraska (Bank), brought this conversion suit against defendant, Scoular-Bishop Grain Co. (Scoular-Bishop), for grain which Scoular-Bishop bought that was subject to a recorded security interest in favor of the Bank. The security agreement required written permission to sell, which was not obtained. Scoular-Bishop claimed that the Bank had knowledge of the sales and that a course of dealing between the parties implied consent, waiver, ratification, and estoppel. At the close of the evidence a $28,941 verdict was directed for plaintiff. Defendant appeals.

A key issue, and the first assigned error discussed, is that the trial court excluded relevant evidence proffered by Scoular-Bishop in support of its defenses.

A right to introduce evidence depends upon there being an issue of fact as to which it is relevant. *Midland-Ross Corp. v. Swartz*, 185 Neb. 484, 176 N.W.2d 735 (1970).

"[A] person who wrongfully sells personal property in which another has an interest is liable for conversion." 18 Am. Jur. 2d *Conversion* § 35 at 179 (1965).

"Authority to sell the collateral might be inferred . . . from the facts and circumstances attending the particular transaction. Such authority depended upon the intent of the parties, and, where circumstances were relied on to show it, its existence was ordinarily a question of fact for the jury." 69 Am. Jur. 2d *Secured Transactions* § 462 at 317-18 (1973).

"Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." Neb. Rev. Stat.

§ 27-103(1) (Reissue 1979). "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Neb. Rev. Stat. § 27-401 (Reissue 1979). "The appropriate standard of review for an assignment of error directed at the exclusion of evidence is one of abuse of discretion." *Lincoln Grain v. Coopers & Lybrand*, 216 Neb. 433, 438, 345 N.W.2d 300, 305 (1984).

During the trial, a part of Scoular-Bishop's evidence was excluded; generally, it included parts of David Rudolph's testimony of oral conversations with bank officers, bank records, checks, deposit slips (other than the five Scoular-Bishop sales), checking account summary, notes and renewal notes, other farm product sales, disability ledger cards, and livestock inspection reports. The judge rejected this evidence as not relevant to show notice, authorization, or waiver, relying on *Garden City Production Credit Assn. v. Lannan*, 186 Neb. 668, 186 N.W.2d 99 (1971), which case we later discuss. The judge patiently allowed and requested Scoular-Bishop to make a full offer of proof outside the hearing of the jury, § 27-103, and the same is included in the stated facts.

Between January 1975 and March 1980, David Rudolph, a farmer near Palmer, Nebraska, borrowed money from the Bank to finance a grain and livestock farm operation. During that time, the line of credit included 61 notes and renewal notes, representing a debt at one time amounting to $180,000. The loans were secured by recorded financing statements and security agreements to the Bank dated September 3, 1975, November 18, 1977, and October 9, 1979, granting a security interest in Rudolph's grain and farm products and proceeds of sale; their sale required the Bank's "prior written consent." During the 1975-80 period, Rudolph made 48 separate sales of secured products without either express oral

or written consent, including the five sales of corn to Scoular-Bishop which are the subject of this lawsuit: (1) April 19, 1979, $9,643.35; (2) August 13, 1979, $7,545.64; (3) October 19, 1979, $2,024.23; (4) October 26, 1979, $8,927.10; and (5) March 4, 1980, $800. In each instance, Rudolph deposited the Scoular-Bishop payment check in his personal account in the Bank; no payments were made on Rudolph's debt except for a part of two sales applied by the Bank as payment on his overdraft. Rudolph paid all of his farming expenses and living expenses out of the same account. At no time did the officials of the Bank request Rudolph to apply any funds to his debt, and the Bank never exercised its privilege of a setoff against the debt. In March 1980 Rudolph's loan was called by the Bank; at the time of trial Rudolph still owed the Bank $52,000.

The Bank had a policy discouraging officers and employees from monitoring the bank accounts of customers, regardless of the status of customer loans. Tellers usually reported large deposits and overdrafts to bank officers. The Bank averaged between 55 and 60 farm-type borrowers. During the prior 15 years, the Bank had never required any borrower to obtain written permission to sell secured farm products. Included in the evidence was the testimony of the Bank president, Roy Densdale, that he was not aware that the security agreement required written permission to sell, and "Q. Does the bank expect every farmer that has a loan with you to get written permission to sell collateral? A. No. Q. And why not? A. Because it isn't required."

During the 1975-80 period, Rudolph generally contacted James Thede, the bank cashier, when discussing his loan, refinancing, disposition of farm products, farm markets, and farm practices. No written permission was ever requested, discussed, or required. Rudolph testified:

Q. [By Mr. Curry] Isn't it true, Mr. Rudolph,

that at the time that the sales were made that no one at the bank knew that you were going to sell that corn to Scoular-Bishop? Isn't that true?

A. Probably not that day, no.

. . . .

Q. [By Mr. Hotz] Mr. Rudolph, you said in response to Mr. Curry's question about no one at the bank knew that you were going to sell grain to Scoular-Bishop, you said probably not that day. Would someone at the bank have known before you sold it?

A. Well, I had corn to sell. It was in the bin. I discussed it, discussed the sale of it. I guess a certain day wasn't really picked.

. . . .

Q. Now, did Mr. Thede discuss with you — did you ever tell Mr. Thede that you were selling either grain or livestock?

A. Yes, sir. It was brought up in conversations, yes.

Q. Did you inform him of sales of livestock and grain?

A. Orally.

Q. Did you report to him the sale prices of those farm products?

A. We may have discussed the price that I thought I might take, or something to that effect.

Q. Did he advise you with regard to a price that he thought you should take as your banker?

A. Not so much advice. He would say, "Well, it sounds good," or something like that. That's about the extent of the conversation, I guess.

Q. Well, I am a little unclear, when he said something like, "That sounds good," were you telling him about prices that you could get for either livestock or corn?

A. Yes.

. . . .

Q. Who normally would bring up the question

of the sale of either grain or livestock?

A. Probably me more than Jim.

Q. Well, did you use Mr. Thede as kind of an advisor?

A. Basically, yes. I thought he was in a position to do so.

Q. To advise you about what?

A. Sale of grain and livestock, because he — I felt he kept up on stuff like that.

Q. Well, before you sold any livestock or grain during this time period between 1978 and 1980, would you make it a point to discuss your thoughts on sales with Mr. Thede?

A. I would try to, yes.

Q. And did you sometimes report back to Mr. Thede as to what price you obtained?

A. Sometimes.

The defendant also sought to introduce the following deposition testimony of James Thede:

Q. Would this be an accurate description of your course of dealings with Mr. Rudolph with regard to the sale of his collateral? You never requested that he obtain your written permission prior to the sale of collateral; that you would counsel with him during such times as his notes were renewed with regard to sale of collateral, giving your banker's advice for the same, but that you would leave it up to his discretion whether or not to sell the collateral? Is that an accurate description?

A. Well, that sounds correct. We never requested him to sell or not to sell.

Applicable Uniform Commercial Code provisions include: "A buyer in ordinary course of business . . . *other than a person buying farm products from a person engaged in farming operations* takes free of a security interest . . . ." (Emphasis supplied.) Neb. U.C.C. § 9-307 (Reissue 1980).

Neb. U.C.C. § 1-205 (Reissue 1980):

Course of dealing and usage of trade.

(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

. . . .

(3) A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.

(4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.

Neb. U.C.C. § 9-306(2) (Reissue 1980):

Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement *or otherwise*, and also continues in any identifiable proceeds including collections received by the debtor.

(Emphasis supplied.)

The weight of authority holds that the term "or otherwise" codifies the common law. *Production Credit v. Sea-First*, 19 Wash. App. 397, 577 P.2d 589 (1978).

We have previously considered on a case-by-case basis the term "or otherwise" where there was a claim of waiver of written consent.

*Overland Nat. Bank v. Aurora Coop. Elevator Co.*, 184 Neb. 843, 172 N.W.2d 786 (1969), was a conversion case holding that a bank without notice of a wrongful sale had no duty to apply a setoff and that the bank

records did not imply an authority to sell.

*Garden City Production Credit Assn. v. Lannan*, 186 Neb. 668, 186 N.W.2d 99 (1971), involved a replevin for cattle. About 90 days before the sale in question, the borrower discussed the sale of cattle. When sold, the sale proceeds were deposited in the borrower's account and credit given on the debt; and when the check did not clear, demand and suit followed. In a 4-to-3 decision the majority held at 675, 186 N.W.2d at 104: "As we have pointed out the mere failure to rebuke the seller, the reasonable acceptance of the proceeds of the sale when actually delivered to apply upon the debt, are not acts which indicate intention to waive a security interest . . . ." The majority discussed the general definition of waiver. That definition was originally set out in *Lipe v. World Ins. Co.*, 142 Neb. 22, 27, 5 N.W.2d 95, 98 (1942):

> " 'Waiver' has been defined as a voluntary and intentional relinquishment or abandonment of a known existing legal right, advantage, benefit, claim, or privilege, which except for such waiver the party would have enjoyed; the voluntary abandonment or surrender, by a capable person, of a right known by him to exist, with the intent that such right shall be surrendered and such person forever deprived of its benefits; *or such conduct as warrants an inference of the relinquishment of such right*; or the intentional doing of an act inconsistent with claiming it."

(Emphasis supplied.)

*Farmers State Bank v. Edison Non-Stock Coop. Assn.*, 190 Neb. 789, 212 N.W.2d 625 (1973), is a conversion case having many facts similar to those presented here. The borrower discussed sales with the lender, and many sales of farm products were made prior to the sale in question. The court held that there had been no waiver, relying on the decision in *Lannan*, and determined that the lender's acts were

not an intelligent and voluntary waiver of its security rights.

These three cases do not turn on the question of relevancy, but, rather, that the weight of the evidence did not establish waiver. Those cases hold generally that where a buyer of farm products subject to a recorded security interest requiring "written consent" relies on the "or otherwise" provision, § 9-306(2), and implied consent, waiver, or ratification by course of dealing, § 1-205, the buyer must prove that the course of dealing was reasonably consistent with the express provisions in the security agreement, § 1-205(4), and that the course of dealing was a voluntary and intentional relinquishment by the secured party of a known and existing right, amounting to waiver, consent, or ratification. Here, Scoular-Bishop's proffered evidence was relevant to the issues presented by the pleadings, and its weight and credibility were for the trier of fact; its rejection was error affecting a substantial right of Scoular-Bishop.

Next, Scoular-Bishop objects to the directed verdict.

> A motion for directed verdict must be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor and to have the benefit of every inference that can reasonably be deduced from the evidence.

(Syllabus of the court.) *Cullinane v. Interstate Iron & Metal*, 216 Neb. 245, 343 N.W.2d 725 (1984).

Our prior decisions provide no standard of proof in these cases when considering a motion for directed verdict or the submission of the case to a jury, other than the decisions in *Aurora Coop.*, *Lannan*, and *Edison*.

The California court, in *Central Cal. Equip. Co. v. Dolk Tractor Co.*, 78 Cal. App. 3d 855, 144 Cal. Rptr.

367 (1978), reviewed decisions of several jurisdictions and discussed this problem.

> [T]here must either be actual prior or subsequent consent in writing by the secured creditor manifesting a purpose to authorize the disposition free of the security interest. Mere acquiescence is insufficient. While we interpret "or otherwise" . . . to permit an implied agreement, we believe that such an implied agreement should be found with extreme hesitancy and should generally be limited to the situation of a prior course of dealing with the debtor permitting disposition. The issue is a question of fact, but the trial court should carefully consider the written prohibition against disposition found in the security agreement as an important factor in the factual determination and should determine the matter in favor of the written prohibition unless such conclusion is unreasonable under the circumstances.

*Id.* at 862, 144 Cal. Rptr. at 371.

We concur with California's statement of caution, and we hold that in these cases the standard of proof is by clear and convincing evidence, being that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. See *Castellano v. Bitkower*, 216 Neb. 806, 346 N.W.2d 249 (1984).

Throughout the record, it is clear that Rudolph had an honorable, open relationship with the Bank. Unfortunately, Rudolph was not a successful farmer, which, combined with the Bank's lax banking practices, resulted in a loss. The Bank argues that Scoular-Bishop could have protected itself by either checking public lien records or making its check payable to Rudolph and the Bank; however, the question presented here is consent, waiver, and ratification.

There was a long-standing, close business relationship between Rudolph and the Bank officers. The

Bank was not concerned with its "written consent" provision in the security agreement, and it did not intend to either require or rely on that provision in the way Rudolph or any of its borrowers sold, consumed, and used farm products.

Considering the evidence as a whole and every reasonable inference as favorable to Scoular-Bishop, the jury could find, under proper instructions, that the course of dealing between the Bank and Rudolph was a waiver, that it implied consent and authority for the sale of grain to Scoular-Bishop free of the Bank's security interest, and that such was reasonably consistent with the express terms of the agreement. The rejection of the proffered evidence was an abuse of discretion, and the directed verdict was error.

REVERSED AND REMANDED FOR A NEW TRIAL.