FARMERS STATE BANK, APPELLANT, V. FARMLAND FOODS, INC.,
DOING BUSINESS AS FARMLAND INDUSTRIES, APPELLEE.

402 N.W.2d 277

Filed March 20, 1987.   No. 85-250.

Knudsen, Berkheimer, Richardson & Endacott, for appellant.

David R. Webb and Brian F. Beckner, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

GRANT, J.

Plaintiff-appellant, Farmers State Bank (hereafter Bank), brought this action for conversion against the defendant-appellee, Farmland Foods, Inc. (Farmland), for damages

based on Farmland's purchase of hogs which were subject to the Bank's security interest. Farmland answered, generally denying it was liable to the Bank in any amount and setting out various defenses to the Bank's action, including the defense that the Bank had impliedly consented to the sale of hogs to Farmland and thus waived the Bank's security interest in that collateral. The case was tried to a jury. At the close of all of the evidence, both the Bank and Farmland moved for a directed verdict. The trial court overruled Farmland's motion and sustained the Bank's motion in part, after finding that the acts of Farmland constituted a conversion for which Farmland could possibly be liable. The issue of Farmland's liability was submitted to the jury for its determination as to Farmland's defenses of waiver, consent, estoppel, and ratification. The jury returned a verdict for Farmland. The Bank timely appealed to this court.

Appellant Bank assigns as error the trial court's actions in submitting to the jury the issues of waiver, estoppel, consent, and ratification and in failing to properly instruct the jury on the issue of waiver by estoppel. For the reasons hereinafter set out, we affirm.

Evidence adduced at trial shows the following. For approximately 15 years ending in the latter part of 1983, David Hopwood was engaged in a hog-raising operation described as a farrow-to-finish operation. The hogs would be raised from birth until they reached market weight, at approximately 5 to 6 months, and would then be sold at market.

In February of 1977 Hopwood approached appellant Bank to obtain financing for his operation. The Bank initially loaned Hopwood approximately $86,000. At that time Hopwood signed a security agreement with the Bank pledging his hogs, among other farm assets, as collateral. The security agreement contained various warranties. One such warranty stated "DEBTOR [Hopwood] WARRANTS AND COVENANTS: . . . (3) Not to sell, transfer or dispose of the Collateral . . . without the prior written consent of the Secured Party [the Bank]."

Despite this requirement for written consent prior to any sale of collateral, Hopwood sold his hogs on over 130 occasions between February 2, 1977, and February 1983, without first

obtaining the Bank's consent. The president of the Bank testified that Hopwood was never questioned about his practice of selling the collateral without having obtained permission, nor did the Bank ever require Hopwood to obtain prior consent to any sale. The Bank president further testified that complying with the provision requiring written consent prior to the sale of the collateral was "humanly impossible" and "physically impossible." He explained the circumstances surrounding a typical sale of a farmer's collateral. The farmer would call the buyer for a quote of the current market price. Depending on the market condition, this quoted price was subject to change if not accepted immediately. Requiring the farmer to obtain permission from the secured party before a sale at the quoted price rather than immediately accepting the offer would require a great deal of the farmer's time and might result in a change in price before the intended sale would be completed. In order for the farmer to keep most of his time available for his farming work and to avoid this possible drop in prices, he must be able to accept the quoted price immediately.

Hopwood testified that between February 2, 1977, through February of 1983, he sold hogs to the defendant, Farmland, approximately 10 to 15 times a year. These sales ranged from 20 to 40 hogs per sale. Hopwood testified that he would check on the price Farmland was paying, and if this was satisfactory, Hopwood would immediately sell and deliver the hogs to Farmland. Hopwood would then take the collateral sale proceeds to the Bank and have these proceeds applied against his loan. During all this time, the Bank was aware of Hopwood's sales to Farmland because Farmland checks were applied to Hopwood's loan with the Bank. Hopwood testified that he never sought permission to sell his collateral in this manner, nor was he ever reprimanded by the Bank for not having done so. After the proceeds were applied to his loan, Hopwood would usually borrow more money for his continuing operation.

On some occasions Hopwood was unable to speak with a loan officer. On these occasions he would deposit the proceeds directly into his farm account rather than giving the proceeds to the Bank for application to reduce the loan account balance.

Then, a few days later, he would return to the Bank and have those proceeds applied to his loan. As an example, the testimony showed that such a procedure was followed in sales on October 25, November 8, and November 9, 1982. The proceeds of these sales were deposited in Hopwood's farm account. Hopwood returned to the Bank on November 16, 1982, and had these deposits applied toward his loan. While there was testimony that the Bank told Hopwood at this time that these direct deposits into his farm account were a violation of the security agreement, Hopwood testified that he did not recall there being any reprimand or censure by officials of the Bank, that, in fact, the November 16, 1982, incident was not isolated, and that on two or three other occasions when direct deposits to his farm account were made, there was no complaint.

The present case concerns six specific sales made by Hopwood to Farmland between April 30 and June 17, 1983. The six sales were of 155 hogs for a price of $16,612.01. The proceeds from these sales were deposited directly into Hopwood's farm account. Rather than returning to the Bank and having these proceeds applied to his loan balance and then borrowing additional funds from the Bank, Hopwood used the proceeds to pay for feed for the hogs and other farm operation expenses. The Bank became aware of these sales in July of 1983, after a state bank examiner noticed a lack of activity on Hopwood's loan sheet. Hopwood was called into the Bank to discuss this inactivity. At this time a plan for an orderly liquidation of the collateral was suggested. Additional funds were advanced by the Bank to Hopwood in order to keep the operation going until the liquidation could be complete. Hopwood continued to sell his hogs just as he had done before the plan for liquidation, until November of 1983, when he filed for bankruptcy. At this point appellant Bank requested all future checks for the sale of collateral be issued jointly to Hopwood and the Bank. Farmland complied with this request on all sales after that time. The Bank then sought to recover the proceeds from the six disputed sales between April 30 and June 17, 1983, in an action for conversion against Farmland.

This court has often held that a jury verdict will not be

disturbed on appeal unless it is clearly erroneous and against the preponderance of the evidence and so clearly contrary to findings that it is the duty of the reviewing court to correct it. Further, a jury verdict is sufficient if there is any competent evidence presented to the jury upon which it could find for the successful party. *Mennonite Deaconess Home & Hosp. v. Gates Eng'g Co.*, 219 Neb. 303, 363 N.W.2d 155 (1985). The district court did not err in submitting to the jury the issue of waiver.

The controlling issue to be determined is whether the Bank, by its conduct over a long period of time, has consented to the sale of the Bank's collateral without its written consent and has thus, by implication, waived its rights in the collateral. The Bank contends that Hopwood did not have express consent to sell the collateral. Consent, however, may be established by implication arising from a course of conduct as well as expressly, and such consent operates as a waiver of the security interest. See, *Hedrick Savings Bank v. Myers*, 229 N.W.2d 252 (Iowa 1975); *United States v. Central Livestock Association, Inc.*, 349 F. Supp. 1033 (D.N.D. 1972); *Moffett Bros. & Andrews Commission Co. v. Kent*, 5 S.W.2d 395 (Mo. 1928).

Waiver has been defined as a "voluntary and intentional relinquishment or abandonment of a known existing legal right *. . . or such conduct as warrants an inference of the relinquishment of such right . . . .*" (Emphasis supplied.) *Five Points Bank v. Scoular-Bishop Grain Co.*, 217 Neb. 677, 681, 350 N.W.2d 549, 552 (1984).

We determine that the evidence as presented in this case was sufficient to support the finding of such conduct that would warrant an inference of the relinquishment of the Bank's right in the collateral in question. There was evidence from which the jury could have found that the Bank, by its long course of conduct of not requiring Hopwood to obtain the Bank's consent to sell collateral, had consented to such sales and thus waived its security interest in the collateral. Despite the covenant not to sell the collateral without prior written consent, Hopwood sold his hogs on more than 130 occasions over a 6-year period without having first obtained the consent of the Bank. Testimony of the bank president showed the Bank was fully aware of these sales. Hopwood testified that the Bank

never requested compliance with this provision of the security agreement. The Bank was also aware of the occasional deposit of the proceeds directly into Hopwood's farm expense account rather than immediate application toward the loan balance. While the evidence is conflicting, it was sufficient for the jury to determine "by clear and convincing evidence" that the Bank had never reprimanded or rebuked Hopwood for his actions. *Five Points Bank v. Scoular-Bishop Grain Co., supra* at 682, 350 N.W.2d at 552. The Bank was fully aware of its right to require the prior written consent for the sale of collateral, yet it so acted as to waive its right.

The appellant Bank argues the security interest continued in the proceeds, and relies on Neb. U.C.C. § 9-306(2) (Reissue 1980), which states:

> Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement *or otherwise*, and also continues in any identifiable proceeds including collections received by the debtor.

(Emphasis supplied.)

It is clear the security agreement involved in this controversy did not authorize the sale of collateral except by prior written consent. Farmland relies on the "*or otherwise*" language in its contention that the Bank had waived its security interest. That language, "or otherwise," was specifically before this court in *State Bank v. Scoular-Bishop Grain Co.*, 217 Neb. 379, 349 N.W.2d 912 (1984), and in *Five Points Bank v. Scoular-Bishop Grain Co., supra*. In *Five Points* at 680, 350 N.W.2d at 551, we reaffirmed the holding in *State Bank v. Scoular-Bishop Grain Co., supra*, and stated that "it was a factual question whether a bank's prior course of dealing with the debtor might create an implied agreement amounting to a waiver of the security interest . . . ."

In this case we hold that the Bank's performance under the Bank-Hopwood security agreement was such that the Bank's conduct constituted, in effect, an amendment to the security agreement, in that the Bank waived its right to require its

written consent to any sale of collateral by Hopwood. On over 130 occasions over 6 years (or approximately twice each month during that time), the Bank acquiesced in Hopwood's method of doing business and consented to it. On at least five occasions the Bank acquiesced not only in the sale of collateral but in Hopwood's failure to immediately apply the proceeds of such sales to the loan owing to the Bank. After 6 years of such conduct, the Bank would now have the courts hold that its business conduct in the marketplace is completely immaterial and that if such conduct results in a loss to the Bank, the Bank is entitled, as a matter of law, to point to the security agreement of 1977 and rely on the words of that agreement that there can be no waiver. We hold that the facts in this case were such as to permit the jury to find that the Bank, by its conduct, waived its contractual right with Hopwood to require that the Bank give written consent to any sale of collateral.

In so holding, we are cognizant of the Bank's contention that its practice of not enforcing the prior written consent provision cannot be construed as a waiver of that provision. The Bank argues that a course of dealing is not applicable to show waiver when it is inconsistent with the express terms in the agreement. Neb. U.C.C. § 1-205(4) (Reissue 1980) provides:

> The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.

The Bank relies on this court's rulings in *Garden City Production Credit Assn. v. Lannan*, 186 Neb. 668, 186 N.W.2d 99 (1971), and *Farmers State Bank v. Edison Non-Stock Coop. Assn.*, 190 Neb. 789, 212 N.W.2d 625 (1973), for support in its contention that mere acquiescence or failure to rebuke the seller is not sufficient to override the express terms of § 1-205(4). We hold that the Bank's reliance on this section is misplaced. Section 1-205(4) deals with a course of dealing and trade usage. Under § 1-205(1), course of dealing is restricted to a sequence of conduct between the parties *previous to the agreement*. See § 1-205, comment 2. See, also, Dugan, *Buyer-Secured Party*

*Conflicts Under Section 9-307(1) of the Uniform Commercial Code*, 46 U. Colo. L. Rev. 333, 340 (1975), where the author states: "Section 1-205 simply does not attempt to deal with the legal consequences of *post-agreement* events such as those which the Code defines elsewhere as 'course of performance' [Neb. U.C.C. § 2-208(1) and (3) (Reissue 1980)] . . . ."

In the case at bar there was no need to know the conduct of the parties before the contract was entered into between Hopwood and the Bank to determine the meaning of that contract. The terms of that contract were clear. The question to be determined is whether the Bank's performance, after that contract was signed, operated to amend the contract. The conduct which might be found to be a waiver of the prior written consent provision occurred continuously *after* this agreement was reached. Such postagreement course of performance is not governed by § 1-205(4). See Burke, *Secured Transactions*, 32 Bus. Law. 1133, 1146 (1977), where the author states: "Section 1-205(4) controls only the interpretation and construction of the written security agreement and should not prevent the introduction of evidence to show that an express term of the agreement has been waived by the secured creditor."

Section 1-205, comment 2, states:

> Course of dealing under subsection (1) is restricted, literally, to a sequence of conduct between the parties previous to the agreement. However, the provisions of the act on course of performance make it clear that a sequence of conduct after or under the agreement may have equivalent meaning. (Section 2-208).

Although § 2-208 generally deals with sales, its terms are made relevant to the security agreement of the parties by the terms of Neb. U.C.C. § 1-201(3) (Reissue 1980), which sets out a general definition as follows:

> "Agreement" means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this act (sections 1-205 and 2-208). Whether an agreement has legal consequences is determined by the provisions of this act, if applicable; otherwise by the law of contracts

(section 1-103).

The court may look to Neb. U.C.C. § 1-103 (Reissue 1980), which provides: "Unless displaced by the particular provisions of this act, the principles of law and equity, including the law merchant and the law relative to capacity to contract . . . shall supplement its provisions."

The code has thus made provisions for dealing with preagreement dealing and postagreement performance. Section 2-208(3) has more relevant application to this situation than does § 1-205(4), which pertains to *preagreement* dealing between the parties. Section 2-208(3) provides: "Subject to the provisions of the next section [Neb. U.C.C. § 2-209 (Reissue 1980)] on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance."

We hold that performance under a security agreement, including the failure of the secured party to rebuke the debtor or object to the debtor's conduct in selling collateral in violation of the terms of the security agreement, may amount to a waiver of the lender's contractual right to require its written consent to a sale of collateral. Whether the secured party's conduct constitutes a waiver of its right to require written consent to a sale of collateral is a question of fact.

Under precode law, conduct such as that of the Bank in the case at bar could have been held to constitute a waiver of the security interest. See, *Charterbank Butler v. Central Cooperatives*, 667 S.W.2d 463 (Mo. App. 1984); *Commercial Credit Corporation v. Blau*, 393 S.W.2d 558 (Mo. 1965); *First Nat. Bank & Trust Co. v. Stock Yards Loan Co.*, 65 F.2d 226 (8th Cir. 1933), *cert. denied* 290 U.S. 648, 54 S. Ct. 87, 78 L. Ed. 576. Since this precode concept of waiver is not specifically displaced by the code, under § 1-103 it must be treated as supplementing the code. The Bank contends that before there can be a waiver, it must be shown that Farmland had knowledge of the Bank's conduct with respect to Hopwood's operations. However, in *First Nat. Bank & Trust Co. v. Stock Yards Loan Co., supra* at 229, the court states: "When a mortgagee under a chattel mortgage allows the mortgagor to retain possession of the property and to sell the same at will, the mortgagee waives

his lien, and this is true whether the purchaser knew of the existence *of the chattel mortgage or not.*" (Emphasis supplied.) We agree with that concept where there is a long course of conduct. To the extent they hold otherwise, this court overrules the cases of *Garden City Production Credit Assn. v. Lannan*, 186 Neb. 668, 186 N.W.2d 99 (1971), and *Farmers State Bank v. Edison Non-Stock Coop. Assn.*, 190 Neb. 789, 212 N.W.2d 625 (1973).

We hold, then, that the jury could have found by clear and convincing evidence that the course of performance between the Bank and Hopwood was a waiver of the security interest in the collateral sold to appellee on the six occasions between April 30 and June 17, 1983. The Bank was fully aware of its right to require written consent before the sale of collateral, yet it never exercised this right nor reprimanded the seller for failure to obtain written consent. The Bank was not concerned with this written consent provision and did not rely on it.

Since the issue of waiver is dispositive of this controversy, we need not consider the other assignment of error. The judgment of the district court is affirmed.

AFFIRMED.

KRIVOSHA, C.J., dissenting.

I must respectfully dissent from the majority in this case. I do so on two grounds. First, I believe we are in error to overrule *Garden City Production Credit Assn. v. Lannan*, 186 Neb. 668, 186 N.W.2d 99 (1971), the leading case in the nation on this subject. Second, I believe that the result reached by the majority in this case is not supported by logic or reason.

While I recognize that there is some split of authority on this subject (see Annot., What Constitutes Secured Party's Authorization to Transfer Collateral Free of Lien Under UCC § 9-306(2), 37 A.L.R.4th 787 (1985)), I believe that the position adopted by this court more than 15 years ago represents the better reasoned position on this subject. In view of the fact that most jurisdictions which follow our earlier longstanding rule cite *Garden City Production Credit Assn. v. Lannan, supra*, as the basis for their decisions, apparently many other jurisdictions agree. Furthermore, I do not believe that anything that we said in *State Bank v. Scoular-Bishop Grain Co.*, 217

Neb. 379, 349 N.W.2d 912 (1984), or *Five Points Bank v. Scoular-Bishop Grain Co.*, 217 Neb. 677, 350 N.W.2d 549 (1984), is contrary to our earlier holding in *Garden City Production Credit Assn. v. Lannan, supra,* nor does it require us to overrule our holding in *Garden City Production Credit Assn. v. Lannan.*

It is clear in this case, as noted by the majority, that there was no express waiver by Farmers State Bank. Nor, in my view, can there be said to be an implied waiver sufficient to cause us to ignore the clear language of the security instrument. The majority makes much of the fact that between April 30 and June 17, 1983, a period of 49 days, six sales were effected by the debtor without the Bank's protest and without the Bank's knowledge. This is suggested by the majority to be sufficient evidence that the Bank had impliedly waived its security. Yet the record discloses that these six transactions were a part of some 60 to 90 sales to Farmland Foods, Inc., conducted over the previous 6-year period in which payment was always made to the Bank following the sale of the livestock. Furthermore, once the Bank learned of the six sales without payment, it did rebuke the debtor and take action. It is apparently the majority's view that the Bank's lien was waived long ago, even though it was being paid. It is simply difficult for me to conclude that six sales conducted without the Bank's actual knowledge within a 49-day period while the debtor is having severe financial difficulty should be the criteria by which we determine the intent of the lender and should be permitted to overshadow 10 times that number of sales where just the opposite result was effected.

The record in this case is clear that the Bank had no knowledge of the six sales before they were made, nor did it learn of the sales until *all* six had been completed. The majority's suggestion that the Bank's failure to rebuke the debtor evidenced implied approval does not wash when the record discloses that the Bank did not know of these six sales until all were completed and, upon learning of the sales, took action.

In my view, the difficulty with the majority opinion is that it has confused an implied waiver of the lien on the security with a waiver by the Bank of a requirement that the lender obtain

permission to sell in writing before proceeding to sell the security. It appears to me that one might more effectively argue that the Bank obviously did not intend to waive its lien when it waived its requirement that permission to sell be in writing, in view of the fact that everyone is presumed to know the law and the Bank knew that under the provisions of Neb. U.C.C. § 9-306(2) (Reissue 1980) and this court's consistent interpretation of that section more than 12 years earlier, as expressed in *Garden City Production Credit Assn. v. Lannan*, 186 Neb. 668, 186 N.W.2d 99 (1971), the sales were all subject to the Bank's lien. That is precisely what § 9-306(2) provides and what it intends to accomplish. Section 9-306(2) does not prohibit the sale of property nor suggest that the mere sale of the property implies that the lien is to be waived. To the contrary, it provides that the security interest continues in the collateral, notwithstanding the sale. To therefore suggest that because the Bank waived a requirement that consent for the sale be in writing, it also waived its lien is not an accurate statement of the law generally recognized throughout the country.

While the records fail to disclose actual authorization by the Bank to sell, it seems to me that the most one can glean from the evidence is that the Bank impliedly consented to the sale of the livestock conditioned upon the debtor's delivering the proceeds of the sale to the Bank, as he had done in the previous 60 to 90 sales. This does not constitute evidence of an intent by the Bank to waive its lien on the security.

As I have suggested earlier, I do not believe that our decision in either *State Bank v. Scoular-Bishop Grain Co.*, 217 Neb. 379, 349 N.W.2d 912 (1984), or *Five Points Bank v. Scoular-Bishop Grain Co.*, 217 Neb. 677, 350 N.W.2d 549 (1984), compels the result reached by the majority today. In *State Bank v. Scoular-Bishop, supra*, we reversed the decision of the district court and remanded the cause for a new trial because the district court had refused to permit the buyer to introduce evidence showing an express waiver and, instead, directed a verdict for the lender. What the purchaser intended to present by way of evidence were oral conversations with bank officers, bank records, checks, deposit slips, checking account summary, notes and renewal notes, other farm product sales,

disability ledger cards, and livestock inspection reports, which may have established that the Bank had in fact waived its lien. In reaching our conclusion in *State Bank v. Scoular-Bishop, supra* at 388, 349 N.W.2d at 917, we nevertheless said:

> "[A]n implied agreement should be found with extreme hesitancy and should generally be limited to the situation of a prior course of dealing with the debtor permitting disposition. The issue is a question of fact, but the trial court should carefully consider the written prohibition against disposition found in the security agreement as an important factor in the factual determination and should determine the matter in favor of the written prohibition unless such conclusion is unreasonable under the circumstances."

The evidence in *State Bank v. Scoular-Bishop, supra*, was to the effect that there had been actual conversations between the debtor and the bank. Yet this court did not overrule *Garden City Production Credit Assn. v. Lannan, supra*, and, in fact, cautioned the trier of fact to find an implied waiver only with extreme hesitancy.

To the same extent, in *Five Points Bank v. Scoular-Bishop, supra*, we reversed and remanded the cause for a new trial because the evidence disclosed that the debtor was encouraged by the bank to minimize his operating loan by obtaining his fertilizer by credit on an open account. Moreover, the bank refused to lend the borrower money for repairs to his farm equipment, acknowledging that the debtor would have to have another advance on his corn crop from someone else. We simply concluded in *Five Points Bank v. Scoular-Bishop, supra*, that it was a question of fact whether the discussion and conduct between the bank and the borrower constituted authorization. Again, we did not suggest we should overrule *Garden City Production Credit Assn. v. Lannan*, 186 Neb. 668, 186 N.W.2d 99 (1971), but, quite to the contrary, suggested that our position was consistent. We merely suggested that it was a question of fact as to whether there had been authorization. *State Bank v. Scoular-Bishop* and *Five Points Bank v. Scoular-Bishop* are not at all similar to the facts in this case.

The real difficulty with the majority opinion is that we are

not writing on a clean slate. The law as declared by this court in *Garden City Production Credit Assn. v. Lannan, supra*, has been the law of this jurisdiction for more than 15 years. During all of that time, the Legislature has not seen fit to amend, in any substantive manner, the law, as did, for instance, the Legislature of the State of New Mexico after the New Mexico Supreme Court decided the case of *Clovis National Bank v. Thomas*, 77 N.M. 554, 425 P.2d 726 (1967), contrary to our position in *Garden City Production Credit Assn. v. Lannan, supra*, and consistent with the majority opinion herein.

While the record does not disclose the fact, one may assume that multiple security agreements have been executed in this state, and farmers have been permitted to sell their livestock as they must, based upon the lender's understanding of our holding in *Garden City Production Credit Assn. v. Lannan, supra*. Yet, with one stroke of the eraser, we now clean the slate and cause all of those security instruments to become invalid because of what we term to be a course of dealing and, therefore, implied consent.

I believe what we earlier said in *Garden City Production Credit Assn. v. Lannan* has even greater applicability today and continues, in my mind, to make good sense.

> The evidence reveals a typical farm-ranch operation contemplating a course of dealing in the sale of farm products, and the necessity of securing credit financing for such an operation. The Uniform Commercial Code, whatever else its objects may be, was designed to close the gap in the classic conflict between the lender and the innocent purchaser and furnish acceptable, certain, and suitable standards which would promote the necessity of and the fluidity of farm credit financing in the modern context, and at the same time facilitate the sale and exchange of collateral by furnishing a definable and ascertainable standard which purchasers could rely on. Case application is in its genesis, but an examination of the textual and court authority supports such an approach to an examination of cases in a specific factual context. See Uniform Commercial Code Bibliography, 1969 (published by the Joint Committee on Continuing Legal

Education of the American Law Institute and the American Bar Association), "Article 9—Secured Transactions," pp. 87 to 101.

186 Neb. at 671-72, 186 N.W.2d at 102.

We went on further in *Garden City Production Credit Assn. v. Lannan, supra* at 673, 186 N.W.2d at 102, to say:

We must assume that section 9-306(2), U.C.C., was drafted with an awareness of the practical realities of farm credit financing, the market movement of chattel property, and the practical problems of a simultaneous sale and payment. This provision of the code must clearly have been designed to accommodate and to fit the practical realities of financing a farming and business operation contemplating the raising, feeding, and processing, and sale of livestock and tangible chattel property. It is uncontested in the present case that there was strict compliance with the filing and notice provisions of the code. Lannan, the purchaser, was bound by the provisions of the code and must ordinarily take the risk of a failure to make the appropriate investigation contemplated by its provisions.

It appears to me that the language of *Garden City Production Credit Assn. v. Lannan*, 186 Neb. 668, 186 N.W.2d 99 (1971), is even stronger today as it applies in the instant case where the purchaser testified that it was not even aware that a lien could be obtained on the farm commodities purchased or that such a filing had been made.

Some of our neighboring states which also have had occasion to examine this issue have, likewise, concluded that our earlier decision in *Garden City Production Credit Assn. v. Lannan* was the better rule. In *North Cent. Kan. Prod. Cred. Ass'n v. Washington Sales Co.*, 223 Kan. 689, 694, 577 P.2d 35, 39 (1978), the Supreme Court of Kansas said:

We have carefully examined the cases and authorities cited by industrious counsel in the original briefs and those *amicus curiae* (all of whose briefs were most helpful), as well as others which our research uncovered. The division of authority is sharp. Some cases support the rationale of *Clovis National Bank v. Thomas*, 77 N.M. 554, 425 P.2d

726 (1967); others—and most writers on the subject—follow *Garden City Production Credit Assn. v. Lannan*, 186 Neb. 668, 186 N.W.2d 99 (1971).

The Kansas Supreme Court then went on to point out that following the decision by the New Mexico Supreme Court in *Clovis National Bank v. Thomas*, 77 N.M. 554, 425 P.2d 726 (1967), "the New Mexico legislature repudiated the *Clovis* doctrine" by amending the Uniform Commercial Code as it applied in New Mexico. 223 Kan. at 694, 577 P.2d at 39. The Kansas Supreme Court then went on in *North Cent. Kan. Prod. Cred. Ass'n v. Washington Sales Co., supra* at 696, 577 P.2d at 41, to say:

> The *Clovis* decision, as we pointed out earlier, is no longer applicable in the jurisdiction where it was adopted. Be that as it may, we do not think its rationale follows the intent of the framers of the Uniform Commercial Code, particularly as expressed in the sections of the code set forth above. We conclude that a ruling, following the *Clovis* doctrine, would hinder "the granting of credit to the capital-intensive agricultural industry" in this state; that such a holding is not in the spirit of the UCC, is not required by its terms, and would not be in the public interest. We therefore follow the rationale of *Lannan*, supra, and find no waiver of a security interest, and no consent to the sales here involved, by PCA's failure to remonstrate with Uffman, following his sales of milk and wheat.

Similarly, the Minnesota Supreme Court in *Wabasso State Bank v. Caldwell Packing Co.*, 308 Minn. 349, 350, 251 N.W.2d 321, 322 (1976), said:

> The question presented is whether one who finances farming operations and takes a security interest in cattle under an agreement which prohibits the sale of the collateral without the financier's prior written approval authorizes the borrower to sell the collateral by not objecting to a course of dealing in which the borrower has previously sold collateral without consent.

In concluding that a waiver did not occur, the Minnesota court said at 353, 251 N.W.2d at 323-24: "Article 9 of the

Uniform Commercial Code established a recording system which permits a creditor, by filing a financing statement, to rely upon the secured position set out in his written security agreement."

The Minnesota Supreme Court then discussed the argument raised by the purchaser to the effect that the bank could have easily protected itself by informing its farm loan debtors that it expected them to adhere to the terms of the security agreement and by reprimanding those who failed to do so, as now suggested by the majority herein. In rejecting that argument the Minnesota Supreme Court said at 354, 251 N.W.2d at 324:

> The fallacy in this argument is that it ignores the realities of the situation. The bank was not made aware of the sales of collateral before they occurred. Farmers would simply notify the bank of the sales when they came in with the proceeds to pay off the loan. At this point, not only was the bank not harmed by the sale but it was presented with an accomplished fact.
>
> Examining the options open to both the bank and the purchasers of the cattle, we have no difficulty in determining which party was in a better position to protect its interests. On the one hand, the bank had complied with all of the provisions of Article 9. It did not rebuke those farmers who sold collateral without authorization, since after the fact such action would have had little effect. It had no prior knowledge of Marczak's plans to sell his cattle. On the other hand, the defendants had constructive notice of the bank's security interest and after checking the records, a simple phone call would have determined whether the bank had authorized Marczak's sale. Alternatively, when paying Marczak for the cattle, defendants could have named Marczak and the bank as joint payees on their check. Either action would have fully protected the bank and defendants. In any event, this is not a case of detrimental reliance since defendants had no way of knowing whether or not the bank had reminded Marczak of the necessity for prior approval of sales.

The Minnesota court then concluded by quoting at length from our decision in *Garden City Production Credit Assn. v.*

*Lannan*, 186 Neb. 668, 186 N.W.2d 99 (1971).

As the majority observes, and as the record in this case establishes, requiring the borrower to obtain written consent from the Bank at 6 a.m. when livestock must be taken to market is not a realistic approach to the situation, nor does it permit the U.C.C., if so interpreted, to deal with the realities of life. We are here given two choices—shall we grant to the lender the benefits of his security, or shall we protect the purchaser who is rewarded by his failure to check the records. As a matter of fact, our decision today would seem to indicate that there is greater benefit in refusing to be provided any information if one wishes to purchase free and clear. What did the purchaser rely upon in making its purchase, and how was it misled by the lender?

I have no difficulty in concluding that by permitting the farmer to sell his livestock without first obtaining written consent, the Bank has waived the requirement for written consent. I have greater difficulty, however, in concluding that by simply waiving one of the requirements for sale, the Bank has thereby impliedly waived its entire security in the property and the benefits of § 9-306(2).

By waiving the requirement that the borrower must obtain written consent, the Bank may not declare the loan in default for failure to obtain such written consent. Nor may the Bank sue the debtor for conversion. It does not necessarily follow, however, that by waiving its right to declare the loan in default by reason of the borrower's failing to obtain written consent before sale or its right to sue the debtor for conversion that the lender impliedly intended to give up its security.

In passing, I must further disagree with the majority's discussion in this case of the effect of Neb. U.C.C. § 1-205 (Reissue 1980). While it may be true that § 1-205 is relevant only with regard to preagreement dealings between the parties, it is not true in this case that all of the dealings herein are postagreement. The transactions between the Bank and the debtor have gone on for nearly 6 years. During that time a host of agreements have been signed and a number of practices conducted. I fear that the majority opinion in this case may be misunderstood to mean that if the parties execute renewal

documents or subsequent loan agreements, the evidence regarding the manner in which they dealt with each other prior to the execution of the last renewal agreement would not be relevant. Certainly that is not what § 1-205(4) means, nor what it is intended to say.

I am not unmindful that the 1985 Legislature has amended Neb. U.C.C. § 9-307 (Cum. Supp. 1986). I purposely make no comment with regard to that because it is not relevant to the instant case.

For all of these reasons, therefore, I would not have overruled our holding in *Garden City Production Credit Assn. v. Lannan*, 186 Neb. 668, 186 N.W.2d 99 (1971), and I would have concluded that the evidence in this case was insufficient to submit to the jury the question of implied waiver. I would therefore have reversed and remanded.

I am authorized to state that CAPORALE and SHANAHAN, JJ., join in this dissent.