902 F.2d 351
 11 UCC Rep.Serv.2d 976
 In the Matter of GREAT WESTERN SUGAR COMPANY, Debtor.
UNITED STATES of America, On Behalf of COMMODITY CREDIT
CORP., Appellant,
v.
SCOTTSBLUFF NATIONAL BANK & TRUST COMPANY, et al., Appellees.
 No. 89-1053.
 United States Court of Appeals,
Fifth Circuit.
 June 1, 1990.
 
 Robert M. Loeb, John F. Cordes, Washington, D.C., Marvin Collins, U.S. Atty., Dallas, Tex., for appellant.
 Gerald P. Laughlin, Steven C. Turner, Baird, Holm McEachen, Redersen, Hamann & Strasheim, Omaha, Neb., for Scottsbluff.
 Steven R. Smith, Haynes & Boone, Dallas, Tex., for Western Nat'l.
 David T. Siegel, FDIC, Omaha, Neb., for FDIC Successor in interest to Bank of Gering & Gering Nat'l Bank, etc.
 Appeal from the United States District Court for the Northern District of Texas.
 Before GOLDBERG, POLITZ and JONES, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 Two secured creditors each claimed a superior security interest in the proceeds of a court-ordered sale of sugar processed by the bankrupt Great Western Sugar Company ("Great Western"). The security interest of one creditor, the Commodity Credit Corporation, (the "CCC"), a federal agency within the Department of Agriculture, arose in connection with Great Western's default on nonrecourse loans made by the CCC. The CCC loaned money to Great Western as part of the CCC's price support program. The security interest of the other creditor, a consortium of Nebraska banks that includes Scottsbluff National Bank (the "Banks"), arose in connection with operating loans that the Banks made to 403 Nebraska farmers (the "Farmers"). The Farmers grew the sugar beets that Great Western processed into sugar. The district court affirmed the bankruptcy court's ruling for the Banks. We affirm.
 
 I. THE FACTS
 
 2
 Great Western operated facilities in Nebraska for producing sugar from sugar beets. For most Nebraska farmers, Great Western was the only available purchaser of sugar beets. Prior to the beginning of a crop season, farmers who wished to grow sugar beets contracted with Great Western to sell their entire sugar beet crop.
 
 
 3
 To cover the expense of growing sugar beets, the Farmers individually sought loans from the Banks. The Banks required each farmer to obtain a contract with Great Western as a prerequisite for a loan. If the bank loaned money to a farmer, the bank perfected a security interest in the sugar beets and any byproducts or proceeds of the sugar beets.
 
 
 4
 The security agreements prevented the Farmers from selling the sugar beets without the Bank's prior written or oral consent. The Farmers did not usually seek consent because after they delivered the sugar beets to Great Western, Great Western routinely issued checks jointly payable to the bank and the farmer. The jointly payable checks were endorsed or signed over to the bank. The bank applied some or all of the check amount to the farmer's debt.
 
 
 5
 Following the harvest of the 1984 sugar beet crop, Great Western borrowed money from the CCC. The CCC administers a loan program, created by Congress, that aids sugar farmers by supporting the price of sugar. Through the CCC, Congress provides nonrecourse loans to sugar processors, in lieu of sugar farmers, because sugar beets, the raw product, perish rapidly and thus cannot adequately be stored as collateral. The CCC loans the processor money to purchase the sugar beets and secures the loan with the sugar produced from the sugar beets. In turn, the processor promises to pay specified support prices when it purchases the sugar beets from farmers.
 
 
 6
 In connection with the Great Western loan, the CCC perfected a security interest in Great Western's refined sugar. In turn, Great Western provided the CCC with a lien subordination agreement. The agreement certified that, except for Great Western's lenders, the sugar was free of other liens.[1]
 
 
 7
 Great Western subsequently petitioned for bankruptcy in the United States Bankruptcy Court for the Northern District of Texas. The bankruptcy court ordered the sale of the sugar pledged by Great Western to the CCC. Based on their perfected security interests, the two secured creditors, the Banks and the CCC, each claimed priority to the proceeds from the court-ordered sale.
 
 II. THE PROCEEDINGS BELOW
 
 8
 The bankruptcy court concluded that the federal statutes and regulations cited by the CCC did not pre-empt Nebraska's commercial laws or provide the CCC with lien priority. The bankruptcy court thus held that a federal rule of decision applied and that the content of that rule was Nebraska law. According to the bankruptcy court, the CCC did not acquire its security interest free of the Banks prior perfected security interest. The bankruptcy court also found that the CCC failed to prove that the Banks waived their security interest by impliedly authorizing the Farmer's sale of the sugar beets, the collateral, to Great Western.
 
 
 9
 The district court affirmed the bankruptcy court's ruling. On appeal, the CCC argues that the Banks impliedly waived their security interest in the sugar beets. We disagree and affirm the court's below.
 
 III. THE LAW
 
 10
 The Nebraska Supreme Court recently discussed implied waivers of security interests in Farmers State Bank v. Farmland Foods Inc.[2] Farmland Foods was an action for conversion brought by Farmers State Bank, the plaintiff, against the defendant, Farmland Foods Inc., a creditor. One of Farmland's defenses was that the bank waived its security interest in the collateral by impliedly consenting to the sale of the collateral to Farmland. A jury returned a verdict for Farmland and the bank appealed.
 
 
 11
 Hopwood, the debtor in Farmland Foods, raised hogs for sales for approximately 15 years ending in the latter part of 1983. In February 1977, Hopwood obtained a loan from Farmers State Bank to finance his operation. Hopwood pledged the hogs and other assets as collateral for the loan and signed a security agreement. The agreement prevented Hopwood from selling the collateral without the bank's prior written consent.
 
 
 12
 Hopwood sold hogs over 130 times between February 1977 and February 1983 without first obtaining the bank's consent. During this period, he sold hogs to Farmland approximately 10 to 15 times per year. The president of the bank testified that the bank never questioned Hopwood about this practice. The president also testified that Hopwood could not comply with the prior consent clause because of the volatility of the market price of hogs. The market price could change in the time required to obtain consent. To make sales, the farmer needed to accept quoted prices immediately.
 
 
 13
 When Hopwood sold hogs to Farmland, he applied the proceeds to his debt with the bank with checks signed by Farmland. In fact, after applying the proceeds to his debt, Hopwood usually borrowed more money for his operation. And when Hopwood could not speak with a loan officer, he deposited the proceeds into his farm account rather than giving the proceeds to the bank to reduce the loan account balance. A few days later, however, he would return to the Bank and ask the Bank to apply the proceeds against the loan account balance. Although at one point the bank mentioned that this practice violated the security agreement, at other times, the bank did not. Clearly, the bank knew Hopwood violated the security agreement's prior consent clause.
 
 
 14
 The dispute in Farmland Foods concerned six specific sales from Hopwood to Farmland between April and June 1983. Hopwood deposited the sales proceeds into his farm account instead of applying them against his debt. When the bank became aware of this activity, it created a plan to liquidate the collateral and advanced additional funds to complete the liquidation.
 
 
 15
 At this point, for all sales of collateral, the bank requested the issuance of joint checks made out to Hopwood and the bank. The bank then sued Farmland for conversion to recover the proceeds from the six disputed sales. The Nebraska Supreme Court affirmed the verdict for Farmland.
 
 
 16
 The Court applied Nebraska Uniform Commercial Code section 9-306(2) to determine whether the bank impliedly waived its security interest in the hogs. Section 9-306(2) states:
 
 
 17
 [e]xcept where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.[3]
 
 
 18
 Under 9-306(2), a creditor impliedly waives its security interest by acting "otherwise." Construing the "or otherwise" language of section 9-306(2), the Court ruled that:
 
 
 19
 performance under a security agreement, including the failure of the secured party to rebuke the debtor or object to the debtor's conduct in selling the collateral in violation of the terms of the security agreement, may amount to a waiver of the lender's contractual right to require its written consent to a sale of the collateral.[4]
 
 
 20
 In applying this rule, the Court stated that "the question to be determined is whether the Bank's performance, after that contract [the security agreement] was signed, operated to amend the contract."[5]
 
 
 21
 We agree with the courts below that the rule of Farmland Foods controls the outcome of the present case. The Farmland Foods Court applied this rule in favor of the creditor, Farmland Foods. The distinctions between the facts in Farmland Foods and the facts in the present case, however, mandate a holding for the Banks. The bank's conduct in Farmland Foods was decidedly different from the Banks' conduct in the present case. According to the Farmland Foods Court, whether the bank's performance amounted to a waiver of its security interest is a question of fact.[6] For the reasons stated in our discussion, the Banks did not waive their security interests in the sugar beets, the sugar, or its proceeds. We thus also agree that, under the rule of Farmland Foods, the bankruptcy court's findings, affirmed by the district court, were not clearly erroneous.[7]
 
 IV. DISCUSSION
 
 22
 The Farmland Foods Court measured waiver by the lender's post-security agreement behavior. In Farmland Foods, the bank impugned the six sales in 1983 after Hopwood sold hogs more than 130 times without the bank's consent. In the language of Farmland Foods, the bank "failed to rebuke" a course of conduct, after the execution of the security agreement, that contravened and thus amended the agreement's prior consent clause.
 
 
 23
 In the present case, however, the Banks contemplated the Farmer's delivery of sugar beets to Great Western, the Farmers only post-security agreement behavior, before they executed the security agreement, by requiring the sales contract between Great Western and the Farmers. The Banks would not execute a loan contract and a security agreement without a sales contract. The transaction encompassed each document. The delivery of the sugar beets, the very behavior contemplated by the transaction itself, did not operate to amend a document integral to the transaction, the security agreement. Thus unlike the bank in Farmland Foods, the Banks did not "fail to rebuke" behavior that contravened the prior consent clause of a security agreement.[8]
 
 
 24
 Moreover, in Farmland Foods, the bank president testified that the hog market's volatility made satisfaction of the prior consent provision impossible. Because of this volatility, the bank apparently considered the provision waived even while the contract was executory. In the present case, however, there is no such testimony. Instead, the transaction required a prior consent provision in the security agreement because the Banks conditioned their loans on the Farmers' execution of a contract with Great Western. The condition implies that the Farmers could not sell collateral to other purchasers without permission.
 
 
 25
 Finally, in Farmland Foods, the bank knew that Hopwood occasionally deposited sales proceeds directly into his farm expense account instead of immediately applying them against the balance of his outstanding loan account. Yet the bank did not request the joint payment of checks from Hopwood's creditors until Hopwood went bankrupt. The bank's actions could be interpreted as waiving the prior consent clause because the bank condoned Hopwood's failure to deposit proceeds from collateral sales until bankruptcy.
 
 
 26
 Unlike Hopwood in Farmland Foods, however, the Farmers in the present case did not do anything that should have required the Bank to enforce the prior consent clauses in the security agreements. Great Western regularly issued checks jointly payable to the individual Banks and to the individual Farmers. These jointly payable checks were endorsed or signed over to the Banks with some or all of the check amount applied to the Farmers' obligation to the Banks. The Farmers thus paid the Banks with proceeds in which the Banks perfected security interests. The Farmers, however, did not use the proceeds in any way that impugned the Banks security interests in the collateral unlike Farmland Foods where the bank did not object to Hopwood's deposit of proceeds in his own account. Compared with the bank in Farmland Foods, the Banks did not have a reason to assert the validity of the prior consent clauses and therefore did not consent or acquiesce to the sale of this collateral.[9]
 
 IV. CONCLUSION
 
 27
 The distinctions between Farmland Foods and the present case demonstrate that the Banks did not waive their security interests in sugar beets, the sugar, or its proceeds. The district court's ruling was not clearly erroneous. We therefore AFFIRM.
 
 
 
 [1]
 The CCC could have avoided this suit by checking the liens of the Farmers to determine whether other liens on the sugar beets existed. To participate in the sugar loan program, a processor must pledge lien free ownership of the refined sugar or must provide the CCC with lien subordination agreements from anyone with a prior first lien in the refined sugar. For the 1984 sugar price support loan program, Great Western granted a security interest to the CCC, provided the CCC with a lien subordination from Great Western's group of lenders, and certified that, except for its lenders' interests, the sugar was free of any other liens
 Prior to making the loan to Great Western, the CCC conducted lien searches under Great Western's name in Nebraska, Colorado, and Texas. The searches revealed that no lien claims existed against Great Western's refined sugar except the lien claims of its lender group. Simultaneous with its lien search, the CCC also filed financing statements and security agreements on the refined sugar in the States of Nebraska, Colorado, and Texas. In accordance with standard policy, if the CCC found prior liens against Great Western, it would have required lien waivers from each secured party.
 Notwithstanding their due diligence concerning Great Western, however, the CCC failed to search for liens under the Farmers' names to ascertain whether prior liens existed on the sugar beets. An officer of Great Western testified that within one day Great Western could produce a list of all Farmers and their contract numbers and addresses. The CCC could have conducted UCC searches on each one. These searches would have disclosed the security interests of the Nebraska Banks.
 Cross-examination revealed that the government searched for liens on all growers in a corn price support program a few years earlier. While burdensome, the searches did not force elimination of the program or require the hiring of a large number of new workers. In the present case, the bankruptcy court found that, although administratively inconvenient and necessitating a few additional employees, the CCC could have searched for liens on all of the Farmers.
 
 
 [2]
 225 Neb. 1, 402 N.W.2d 277 (1987)
 
 
 [3]
 Neb.Rev.Stat. U.C.C. section 9-306(2) (Reissue 1980) (emphasis added)
 
 
 [4]
 Farmland Foods, 225 Neb. at 9, 402 N.W.2d at 282 (emphasis added)
 
 
 [5]
 Farmland Foods, 225 Neb. at 8, 402 N.W.2d at 281 (emphasis added)
 
 
 [6]
 Farmland Foods, 225 Neb. at 6, 402 N.W.2d at 280-81
 
 
 [7]
 In re Heci Exploration Co., 862 F.2d 513, 518 (5th Cir.1988) ("Where we are asked to review the bankruptcy court's findings of fact that have been affirmed by the district court, the clearly erroneous rule will be strictly applied.")
 
 
 [8]
 The government, however, argues, for the first time on appeal, that the Bank's requirement of the sales contracts as prerequisites for the loans means that the Bank's authorized the sales of the sugar beets. According to the government, this authorization means that the Banks' security interests terminated at the time the Farmers delivered the sugar beets to Great Western. We disagree. The Banks' condition of a sales contract with Great Western supports the conclusion that the Banks, in the language of Farmland Foods, did not "fail to rebuke" the Farmers and thus did not waive the security agreement's prior consent clause
 
 
 [9]
 Because the Banks in the present case: (1) contemplated the Farmers' sale of the collateral; (2) did not suggest that the prior consent clause was difficult or impossible to satisfy; and, (3) received payment by joint check, the Eighth Circuit's decision in Neu Cheese Co. v. F.D.I.C., 825 F.2d 1270 (8th Cir.1987) is similarly distinguishable