GRETNA STATE BANK, A NEBRASKA CORPORATION, APPELLANT AND CROSS-APPELLEE, V. CORNBELT LIVESTOCK COMPANY, A NEBRASKA CORPORATION, APPELLEE AND CROSS-APPELLANT.

463 N.W.2d 795

Filed December 7, 1990.   No. 88-677.

716

E. Terry Sibbernsen, of Welsh & Sibbernsen, for appellant.

Victor J. Lich, Jr., and John M. Vodra, of Lich, Herold & Mackiewicz, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

BOSLAUGH, J.

This is an action in conversion by the plaintiff, Gretna State Bank (Bank), against the defendant, Cornbelt Livestock Company. The petition alleged that from April 3 through December 5, 1985, the defendant, which is a marketing agency, sold dairy cattle owned by Gordon Schuemann in which the plaintiff had a perfected security interest. The defendant's answer alleged, among other defenses, that the plaintiff had consented to and authorized the sales of Schuemann's cattle.

The defendant's motion for a directed verdict was overruled, and the case was submitted to the jury. The jury found for the defendant. The plaintiff has appealed, and the defendant has cross-appealed.

The record shows that the important facts involved in this appeal are undisputed. The Schuemanns, who operated a dairy farm near Gretna, Nebraska, had been customers of the Bank since the 1970s, and had borrowed money from the Bank for their farming operations. These loans were secured pursuant to several security agreements which granted the Bank a secured interest in all of the Schuemanns' crops, livestock, farm products, machinery, and equipment, and in all proceeds from, substitutions, additions, and accessions to the collateral.

The security agreements expressly prohibited the sale of the collateral without the prior written consent of the Bank.

However, this provision was never enforced by the Bank, and the practice was for the Schuemanns to sell cows from time to time and deposit the proceeds in their checking account at the plaintiff Bank or their checking account at the Bank of the Midlands. The proceeds from the sale of the cattle were used to pay Schuemanns' farm operating expenses.

Ronald Suhr, who had been employed by the Bank since 1959 and was its president from 1983 until he left in 1985, testified that the Schuemanns retired their debt through milk assignments.

According to Suhr, the Bank's policy in 1985 regarding sale of collateral subject to a security interest was to have the debtor notify the Bank by telephone or personally discuss the matter prior to sale and apply the proceeds to the debtor's loan. However, the Bank did not enforce this policy and did not require the debtor to obtain permission in advance to sell livestock, although it expected the policy would be complied with. Other Bank borrowers sold secured collateral without permission and were not rebuked for the sales.

The Bank's records regarding the Schuemanns show significant numbers of cattle missing from year to year between 1977 and 1985. The Bank never objected to the missing cattle as long as the herd stayed around 60 head. The Bank never required Schuemanns to account for the proceeds from sales of those missing cattle from year to year.

The Bank never discussed with the Schuemanns its policy of requiring permission prior to selling collateral; however, the Bank told them the proceeds should come to the Bank.

On September 15, 1978, the Schuemanns' financial statement to the Bank showed that there were 60 cows on hand. On the December 1, 1979, financial statement there were shown 50 cows. The Bank did not object to the missing cows in that case. On the September 1, 1980, financial statement, there were listed 35 cows. There was no objection by the Bank to the 15 missing cows, and the Bank did not ask Schuemanns to account for the proceeds from sale of those cows. On the October 1, 1981, financial statement, there were listed 52 cows, 5 heifers, 18 calves, and 1 bull, for a total of 76 head. There was no financial statement for 1982. On the April 1, 1983, financial

statement there were shown 55 cows and 1 bull. The Bank did not object to the sale of the missing cattle or ask the Schuemanns to account for the proceeds.

The Bank's credit file memorandum also shows that on August 31, 1983, there were 84 cows. On the September 1, 1984, financing statement there were listed 60 cows, 5 heifers, 1 calf, and 1 bull, for a total of 67 head. The Bank did not ask the Schuemanns to account for those 24 missing cows.

The Bank's memorandum does not show any significant death loss. It does not show any request by the Schuemanns to sell the cows, and it does not show that the Bank received any proceeds from the sale of missing cows. Furthermore, it does not show that the Bank ever rebuked Schuemanns for failing to account for those cows.

The Bank knew the Schuemanns were selling cows; however, as long as there was a minimum herd, the Bank did not care whether they sold cows because it was relying on the milk assignments to repay the Schuemanns' notes.

Randall Helgren, who was president of the Bank from August 1985 to June 1986, testified that he conducted an inspection on October 15, 1985, because he had not seen a livestock inspection in the Schuemanns' file. During that inspection, the Schuemanns did not discuss the sale of any of the cows and did not ask permission to sell any of the cows. The inspection showed there were 65 cows and 30 calves. Based on that inspection, the Bank renewed the Schuemanns' note on January 22, 1986.

Helgren also testified that the Bank never enforced its policy of written or oral permission prior to sale of collateral in which it had a security interest. About 80 percent of the Bank's debtors sold collateral without obtaining permission first.

Helgren was not aware of anyone at the Bank discussing with the Schuemanns the Bank's policies regarding the sale of collateral. He assumed that there were sales being made by the Schuemanns, and to his knowledge no one from the Bank ever made them account for those sales until February 1986, when he conducted another inspection which showed the herd had been reduced to 19 cows and 30 calves.

No one at the Bank rebuked the Schuemanns for 25 cows

missing between November 7, 1984, and January 3, 1985.

In December 1985 and January 1986, the Bank did not receive full payments from the milk proceeds. The Bank did not declare the Schuemanns in default but, instead, renewed their loan on January 22, 1986, and did not check the collateral prior to renewing the loan.

According to Helgren, the milk assignments were the primary source of repayment for the Schuemanns' loans.

Gordon Schuemann testified that he had always sold cows and calves in his operation and that he had used Cornbelt as his marketing agent for 25 years. He had no discussions with the Bank about the Bank's policy of requiring permission prior to taking the cows to market, and did not ask the Bank for permission to sell his cattle. The Bank did not express concern about the sales he had made throughout his relationship with it, and the Bank did not ask him to account for proceeds of those sales. Milk assignments were used to reduce the balance on his debts with the Bank.

The Bank never told Schuemann not to sell the cows, and prior to 1986, the Bank did not object to the sales he had made.

The Bank's course of conduct in this case constituted a waiver of the Bank's security interest in the cattle as a matter of law.

Neb. U.C.C. § 9-306(2) (Reissue 1980) states in relevant part: "[A] security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise . . . ."

The "otherwise" language in § 9-306(2) includes a prior course of conduct constituting authority to sell pledged collateral. *Farmers State Bank v. Farmland Foods*, 225 Neb. 1, 402 N.W.2d 277 (1987); *Ottumwa Prod. Cred. v. Heinhold Hog Mark.*, 340 N.W.2d 801 (Iowa App. 1983); *Hedrick Savings Bank v. Myers*, 229 N.W.2d 252 (Iowa 1975).

In *Farmers State Bank v. Farmland Foods, supra* at 9, 402 N.W.2d at 282, we held:

> [P]erformance under a security agreement, including the failure of the secured party to rebuke the debtor or object to the debtor's conduct in selling collateral in violation of

the terms of the security agreement, may amount to a waiver of the lender's contractual right to require its written consent to a sale of collateral.

Consent to the sale of collateral without prior written permission may be established expressly or by implication arising from a course of conduct, and such consent operates as a waiver of the security interest.

The Bank argues that even if it consented to the Schuemanns' sale of cattle through its prior course of conduct, its authorization was limited to selling cows from the herd for culling purposes. The Bank contends that the sales in question were part of a course of conduct by the Schuemanns to liquidate the herd.

The sales in question took place from April 3, 1985, through December 5, 1985. A total of 39 cows were sold, with no more than 5 cows being sold on any single occasion.

On October 15, 1985, the Bank inspected the Schuemanns' operation. On that date there were 65 milk cows and 30 calves. According to the testimony of both of the Bank's presidents, the collateral on that date was within the acceptable limits for producing milk for the assignments on which the Bank relied for repayment of the Schuemanns' loans.

The evidence shows that from the October 15, 1985, inspection through December 5, 1985, only seven cows were sold. The course of conduct for the sales in question was no different from that established during the time between 1978 and 1985, when, at times, the herd was reduced below the 60-head figure which the Bank preferred.

In *Farmers State Bank v. Farmland Foods, supra,* the evidence showed that despite a provision in the security agreement prohibiting the sale of collateral without prior written consent, the debtor sold his hogs on over 130 occasions over a 6-year period without first obtaining prior consent from the bank; the bank was aware of the sales; the bank never requested compliance with the consent provision; the bank never reprimanded or rebuked the debtor for his actions; and the bank was aware of its right to require the prior written consent for the sale of collateral, but it acted to waive its rights thereunder. This court held the bank's course of performance

with the debtor constituted an amendment to the security agreement waiving its right to require its written consent prior to any sale by the debtor. *Farmers State Bank, supra.*

The evidence in this case shows the Bank knew the Schuemanns were selling cows without prior written permission; however, as long as the herd remained at about 60 head, the Bank did not care that the Schuemanns were selling their cows without prior written permission because the Bank relied on the milk assignments to repay the Schuemanns' notes; the Bank never discussed with the Schuemanns its policy of requiring permission prior to selling collateral; although the Schuemanns were told the proceeds should come to the Bank, the Bank never made the Schuemanns account for the proceeds of the cattle they sold; and the Bank never reprimanded or rebuked the Schuemanns for the sale of the cows. The Schuemanns were not declared in default until February 26, 1986, when the herd had been reduced to 19 cows and 30 calves. It is apparent that the default was declared because the Schuemanns had failed to maintain the herd at an adequate number for milk production in order to repay their loans with the milk assignments, not because of the sales of cattle which had taken place during the dates in question.

Where the evidence at trial is not in conflict and reasonable minds cannot differ as to the conclusion to be drawn from the evidence, it is the duty of the trial court, when requested, to direct a verdict in accordance with such conclusion. *Vermaas v. Heckel*, 170 Neb. 321, 102 N.W.2d 647 (1960). Based on the documents and admissions by the Bank's presidents that the Bank did not care whether the Schuemanns sold cows as long as the herd remained at about 60 head, there was no disputed issue of fact regarding the Bank's course of performance establishing the Schuemanns' authority to sell the cattle pledged as security for their notes.

In *Neu Cheese Co. v. Fed. Deposit Ins. Corp.*, 825 F.2d 1270 (1987), the U.S. Court of Appeals for the Eighth Circuit held, under similar facts, that a factual finding to the contrary was clearly erroneous and that as a matter of law the bank had waived its security interest by its conduct. The evidence in this case establishes as a matter of law a waiver by the Bank of its

security interest in the cattle sold by the Schuemanns.

The trial court should have sustained the defendant's motion and directed a verdict in favor of the defendant, as the evidence established it was entitled to judgment as a matter of law.

It is unnecessary to consider the assignments of error relating to the instructions or the other errors assigned in the cross-appeal.

The judgment for the defendant is affirmed.

AFFIRMED.