BATTLE CREEK STATE BANK, APPELLANT,
V. RON HAAKE, APPELLEE.
587 N.W. 2d 83

Filed December 4, 1998.    No. S-97-713.

W. Bert Lammli for appellant.

Forrest F. Peetz, of Peetz & Peetz, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

MILLER-LERMAN, J.

Battle Creek State Bank (BCSB) appeals a jury verdict entered in favor of Ron Haake following the trial of BCSB's conversion claim and the denial of BCSB's motion for new trial. BCSB alleged that Haake wrongfully converted certain cash proceeds which BCSB alleged belonged to it. BCSB assigns as error the trial court's refusal to retroactively apply the 1994 amendments to Neb. U.C.C. § 9-306(2) (Cum. Supp. 1994) and the entry of the jury's verdict finding that BCSB impliedly waived its right to enforce its security interest in certain cash proceeds. For the reasons recited below, we conclude that the 1994 amendments to § 9-306(2) are not retroactive and that there were no reversible errors in connection with the court's evidentiary rulings or instructions. Accordingly, we affirm.

## I. FACTS

In 1986, BCSB began a farm-lending relationship with Todd and Deb Duhachek. The Duhacheks farmed in Madison County, Nebraska. The farm included a small, grade B dairy operation with 25 to 30 cows. When the lending relationship commenced, the Duhacheks granted BCSB a blanket security interest in all of the farm equipment, inventory, and proceeds then owned and thereafter acquired by the Duhacheks. BCSB properly filed and perfected this financing statement and security agreement in

Madison County on April 21, 1986, in accordance with the terms of Nebraska's Uniform Commercial Code (U.C.C.).

The Duhacheks moved to a farm in Holt County, Nebraska, in late spring of 1990. According to Todd Duhachek, the objectives for moving the family's farming business to Holt County were to increase and improve its dairy operation and to correspondingly decrease crop production. The Duhacheks' new farm included facilities for grade A milk production which were larger and more elaborate than the grade B production facilities at the Duhacheks' farm in Madison County. BCSB extended additional loans to the Duhacheks when they moved to Holt County, and BCSB obtained an additional financing statement and security agreement from the Duhacheks, which BCSB filed in Holt County on November 29, 1990, to perfect its ongoing security interest in all of the Duhacheks' property and proceeds.

While farming in Madison County from 1986 through 1990, the Duhacheks sold milk produced by their dairy herd to Dodge Dairy, which collected the raw milk from the Duhachek farm every other day. Dodge Dairy paid the Duhacheks for the raw milk. After Dodge Dairy ceased operation, the Duhacheks subsequently did business with Mid-America Dairymen, Inc. (Mid-Am), in essentially the same manner. After their move to Holt County in 1990, the Duhacheks had an identical business relationship with the Northeast Nebraska Milk Producers Co-op.

The financing statements and security agreements which memorialized BCSB's security interest provided that the Duhacheks could not sell or transfer their interest in any of their farm property or proceeds therefrom without prior written authorization from BCSB. Todd Duhachek testified that at all times, BCSB knew that the Duhacheks were selling the milk produced by their dairy operation and that BCSB expected them to do so. It was uncontroverted that when the Duhacheks sold their milk, they never obtained advance written authorization from BCSB as specified in the financing statements, and that BCSB did not require them to do so. Roger Brestel, president of BCSB, stated that the bank intended and expected that the Duhacheks would sell the milk in which BCSB claimed a security interest without obtaining a written waiver from BCSB for each sale because "it was just something that everybody understood."

When the Duhacheks moved to Holt County, they owned approximately 35 dairy cows. Almost immediately, they increased the size of their herd by purchasing additional cows from local sellers, including Haake. Haake had been a dairy farmer in Holt County for 28 years, and in 1990, he sought to reduce and eventually end his dairy operation. When Haake learned of the Duhacheks' move into the area and their interest in expanding their dairy herd, he struck a deal with them in April 1990 to sell the Duhacheks 28 dairy cows. The Duhacheks took possession of the cows, and they agreed to pay Haake on a monthly basis with proceeds from the sale of the cows' milk. The Duhacheks notified Mid-Am of the arrangement, and the Duhacheks executed a written authorization assigning their interests in $930 of each month's proceeds from the sale of milk to be paid by Mid-Am directly to Haake. Todd Duhachek testified, and Brestel admitted at trial, that at some point in 1990, Todd Duhachek notified BCSB of the assignment of proceeds to Haake, and BCSB did not object to the assignment or payment to Haake. The Duhacheks completed payment of their debt to Haake for this lot of cows in April 1993.

In late 1992, the Duhacheks contacted Brestel and requested that BCSB loan them money to further expand their dairy herd. BCSB refused to do so because of concerns about the Duhacheks' ability to repay the loan. The Duhacheks subsequently arranged with Haake to purchase a second lot of cows from him, again with payments extended over a period of months by assignment of the Duhacheks' milk sales proceeds to Haake.

Haake testified that he discussed with his banker, Ralph Adams, who was apparently not associated with BCSB, his sales arrangements with the Duhacheks. Brestel testified that Adams telephoned him at least once to discuss the sales. Before confirming the sales arrangements with the Duhacheks, Haake took no other steps to ascertain if the Duhacheks' property, including after-acquired property, was subject to any preexisting security interest.

After Haake agreed to the deal for the sale of the second lot of dairy cows, the Duhacheks took possession of 26 Holstein cows from Haake. The Duhacheks executed a promissory note

to Haake for $23,400 for the second purchase of cows on August 1, 1993. The precise date upon which the Duhacheks took possession of these Holsteins is not clear. The record does, however, contain a financing statement and security agreement executed by the Duhacheks in favor of Haake on August 3. Haake filed this document on August 18 and thereafter asserted a purchase money security interest in the second lot of cows that he had sold to the Duhacheks, including both products and proceeds therefrom.

In accordance with the terms of the agreement, the Duhacheks began paying Haake $755 per month for the second lot of cows on August 15, 1993, after the cows freshened. The payments were made directly to Haake by the Northeast Nebraska Milk Producers Co-op based on the Duhacheks' written assignment of monthly milk sales proceeds in that amount to Haake. Todd Duhachek testified that the second lot of Holsteins produced enough, if not more than enough, milk to cover the cost of the monthly payments to Haake due in connection with the second purchase.

The additional cows continued to bear Haake's brand after the Duhacheks took possession of them. The cows were intermingled with the rest of the dairy herd on the Duhachek farm premises, which was inspected periodically by Brestel and other BCSB representatives in 1993 and 1994. There is no evidence that the Duhacheks tried to conceal this addition to their herd during these inspections by BCSB and its agents.

Todd Duhachek testified that he told Brestel about the August 1993 purchase from Haake after the Duhacheks had executed a written assignment of milk sales proceeds to Haake. Deb Duhachek testified that she did not inform Brestel or other BCSB representatives about the second purchase because she believed that her husband had already done so. Brestel denied that either Todd or Deb Duhachek had advised BCSB of the second purchase from Haake or the 1993 assignment of the Duhacheks' milk sales proceeds to Haake.

Brestel testified that BCSB began to "closely monitor" the Duhacheks' financial status in 1992, specifically examining every one of their deposit and withdrawal transactions. In March 1992, BCSB and the Duhacheks executed a written

agreement in which the Duhacheks pledged to deposit all of the proceeds they received from their milk sales into an account at BCSB and to make payments totaling $800 monthly to BCSB to reduce their loan indebtedness to BCSB. Before that time, the Duhacheks had no set schedule for making payments to BCSB, and BCSB did not require such a schedule. Brestel testified that so long as BCSB received the monthly payment specified in the March 1992 agreement, BCSB permitted the Duhacheks to spend the remaining cash in their account, including milk sales proceeds, at the Duhacheks' discretion. Brestel testified that BCSB's close scrutiny of the Duhacheks' accounts never yielded evidence of improper expenditures by the Duhacheks, whom Brestel described as "forthright" in their financial affairs.

A little more than a year later, on April 26, 1993, the Duhacheks executed two renewals of their loan obligations to BCSB. Again, the Duhacheks completed a financing statement and security agreement in which they granted BCSB a security interest in all of their presently owned and after-acquired property. BCSB filed this financing statement and security agreement to perfect its security interest. The promissory note renewals associated with the April 26 agreement were also secured by prior perfected security interests in favor of BCSB.

At about the same time, Brestel telephoned Roger Henn, president of the Northeast Nebraska Milk Producers Co-op, which was then purchasing the Duhacheks' milk. Brestel verbally requested that the co-op make all of the Duhacheks' milk proceeds checks payable jointly to the Duhacheks and BCSB, but Brestel neither obtained from the Duhacheks nor offered to the co-op a written assignment from the Duhacheks authorizing the joint mode of payment. In March or April 1993, Brestel initiated a similar telephone call to Don Walmsley, who was at that time the president of the Northeast Nebraska Milk Producers Co-op. Walmsley told Brestel that the co-op needed written documentation to justify joint payment to the Duhacheks and BCSB. Brestel did not provide Walmsley or the co-op with a written authorization by the Duhacheks consenting to the joint mode of payment of their milk sales proceeds, but Brestel sent Walmsley a photocopy of an earlier perfected financing statement and security agreement executed by the Duhacheks in

favor of BCSB. The record contains photocopies of checks dated April 26, 1993, through March 1994 for sums derived from the Duhacheks' milk proceeds made payable by the Northeast Nebraska Milk Producers Co-op jointly to the Duhacheks and BCSB. At no point, however, did the Duhacheks execute a written assignment of their milk proceeds to BCSB. Walmsley testified at trial that written assignments of proceeds are commonly used by dairy producers to pay their creditors.

The checks issued by the Northeast Nebraska Milk Producers Co-op, which were made payable jointly to the Duhacheks and BCSB, represented the remainder of the sale proceeds due to the Duhacheks after payment of their authorized assignment payments issued directly to creditors, including Haake. Other creditors also received payment by assignment from the Duhacheks' milk proceeds, including Mart and Phyllis Preusker, Deb Duhachek's parents who had loaned money to the Duhacheks, and Ken and Ann Kasselder, from whom the Duhacheks had purchased other dairy cows.

Walmsley testified that when Brestel called him in March or April 1993 to request that BCSB be added as a joint payee on the Duhacheks' milk proceeds checks, Walmsley told Brestel that other creditors of the Duhacheks were receiving monthly payments from the Duhacheks' milk payments as a result of written assignments of proceeds executed by the Duhacheks in favor of these other creditors. Walmsley testified that he did not specifically name the creditors to Brestel. Brestel neither requested the identities of the creditors nor voiced disapproval or made any other comment regarding the assignments already being paid from the Duhacheks' milk proceeds.

The Duhacheks satisfied their monthly loan payments to BCSB until July 1994, during which time they made a partial payment to BCSB. The Duhacheks thereafter defaulted on their loans to BCSB, as well as on their financial obligation to Haake. BCSB sent the Duhacheks a letter in late September, demanding that the Duhacheks surrender all of their milk proceeds to BCSB. Deb Duhachek testified at trial that after receipt of that letter, BCSB did, in fact, take all of the Duhacheks' monthly milk proceeds, leaving the Duhacheks with no money upon

which to live and run their farm. The Duhacheks filed for bankruptcy protection in December.

Haake received slightly more than $12,000 from the Duhacheks in milk proceeds assignments for the second lot of cows which he sold to them in 1993. Haake testified at trial that the Duhacheks still owed him approximately $11,400.

BCSB filed suit against Haake in late 1995, alleging that Haake converted to his own use proceeds from the sale of the Duhacheks' milk which were the rightful property of BCSB. In response, Haake claimed that BCSB had forfeited the right to enforce its security interest in the Duhacheks' milk sales proceeds by consenting to the Duhacheks' sale of milk and application of proceeds without prior authorization from BCSB and that BCSB had thereby impliedly waived its security interest.

Prior to trial, both parties sought summary judgment. In an order dated May 6, 1996, the district court wholly denied Haake's motion, and it granted BCSB's motion in part. The trial court held that BCSB properly perfected its security interest in the Duhacheks' cows, milk, and the proceeds therefrom and that the financing statements and security agreements executed by the Duhacheks were given to BCSB to secure an existing debt. The trial court found that the monies paid by the Duhacheks to Haake by milk assignments were derived from the sales of milk which were covered by BCSB's security interest, and the court held that unless Haake established at trial that BCSB had waived its security interest, the milk proceeds paid to Haake rightfully belonged to BCSB. Accordingly, the trial court ordered that the issues for trial were limited to whether BCSB impliedly consented to the Duhacheks' sale of their milk without the written consent of BCSB and BCSB thereby waived its security interest in the milk and its proceeds and, in the event the jury found such consent and waiver by BCSB, the date upon which it commenced, and whether such consent and waiver extended beyond April 19, 1994, the effective date of certain amendments to § 9-306(2).

The case proceeded to trial by jury on March 31 and April 1, 1997. In connection with evidentiary rulings and jury instructions, BCSB sought unsuccessfully at trial to have the court treat certain amendments to § 9-306(2) effective April 19, 1994,

as retroactive in application, and controlling as a matter of law. A review of the record shows that in its jury instructions, the court advised the jury of the existence of the amendments but did not mandate how to apply them, allowing the jury to determine the amendments' application in accordance with the jury's findings of fact. The jury found for Haake in all respects. BCSB timely moved for a new trial. The motion was denied on June 5, 1997. BCSB appealed. Haake's motion to bypass the Nebraska Court of Appeals was granted by this court.

## II. ASSIGNMENTS OF ERROR

BCSB lists 11 assignments of error, the majority of which overlap. BCSB argues on appeal that the trial court's rulings and instructions erroneously construed and applied portions of the U.C.C., including § 9-306(2), which was amended effective April 19, 1994, partway through the time period during which Haake received milk assignment payments from the Duhacheks. Specifically, BCSB claims that it was entitled to judgment as a matter of law that all milk sales proceeds received by Haake after April 19 were wrongly converted by Haake, including all proceeds generated after September 21, the date upon which BCSB's counsel made demand for such upon the Duhacheks. BCSB also claims that the trial court incorrectly failed to instruct the jury that the amendments to § 9-306(2) were to be applied retroactively to April 19, that it failed to properly instruct on the application of § 9-306(2) as to the period after April 19, and that these allegedly erroneous instructions denied BCSB a fair trial. BCSB argues that the practical effect of the allegedly erroneous jury instructions was a wrongful modification of the summary judgment which had been granted in its favor before trial.

## III. STANDARD OF REVIEW

Statutory interpretation is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the courts below. *State v. Burlison, ante* p. 190, 583 N.W.2d 31 (1998).

## IV. ANALYSIS

All of the issues framed by BCSB on appeal focus upon the "implied waiver" defense asserted by Haake against BCSB. Haake claimed that BCSB waived the right to enforce its security interest in Duhacheks' cows, their milk, and the proceeds therefrom for the entire period in question as a result of BCSB's consent to the Duhacheks' sale of milk without prior written authorization from BCSB and the Duhacheks' use of the sales proceeds for purposes other than repayment of their debt to BCSB.

### 1. U.C.C. OVERVIEW:
#### IMPLIED WAIVER DEFENSE AND 1994 AMENDMENTS

The trial court's pretrial order on the competing summary judgment motions filed by BCSB and Haake shaped the ultimate issues presented to the jury at trial. Because BCSB had established its security interest in the context of the summary judgment motions, the trial was limited to Haake's proof of its defense of implied waiver. In its summary judgment opinion, the trial court analyzed the "tortured" history of the implied waiver defense as it relates to enforcement of security interests, particularly regarding farm products. Section 9-306(2) provides that a creditor which has a security interest in collateral pledged by a debtor to secure payment possesses a recognizable interest in the collateral as well as a continuing security interest in identifiable proceeds from the sale or other disposition of that collateral, "unless the disposition was authorized by the secured party in the security agreement *or otherwise.*" (Emphasis supplied.) The "or otherwise" portion of § 9-306(2) has, over time, provided the basis for various defenses to a secured party's attempted enforcement of its security interest, including the defense of implied waiver. See 9 Ronald A. Anderson, Anderson on the Uniform Commercial Code §§ 9-306:15 to 9-306:22 (rev. 3d ed. 1994).

"Waiver" is generally recognized as a party's voluntary and intentional relinquishment or abandonment of a known legal right, advantage, benefit, claim, or privilege which, except for the waiver, that party would have enjoyed. *Five Points Bank v. Scoular-Bishop Grain Co.*, 217 Neb. 677, 350 N.W.2d 549

(1984). Waiver may be demonstrated or inferred from a party's conduct. *Elliot v. First Security Bank*, 249 Neb. 597, 544 N.W.2d 823 (1996). The implied waiver defense has often been asserted in cases where a secured creditor seeks to recover the proceeds of a debtor's sale or other disposition of farm products. See, e.g., *Gretna State Bank v. Cornbelt Livestock Co.*, 236 Neb. 715, 463 N.W.2d 795 (1990); *Farmers State Bank v. Farmland Foods*, 225 Neb. 1, 402 N.W.2d 277 (1987); *Garden City Production Credit Assn. v. Lannan*, 186 Neb. 668, 186 N.W.2d 99 (1971). The implied waiver defense has also been asserted in cases where competing creditors, such as Haake and BCSB, sought to recover the same collateral or proceeds from a common debtor. See *Five Points Bank v. Scoular-Bishop Grain Co., supra.*

Until relatively recently, purchasers of farm products, unlike other buyers in the ordinary course of business, generally could not purchase such products free of security interests to which the seller had pledged the goods. Farm product purchasers were therefore subject to paying twice for the same goods—once to the seller, and again to a party which held a security interest in the goods. *Battle Creek State Bank v. Preusker*, 253 Neb. 502, 571 N.W.2d 294 (1997); Neb. U.C.C. § 9-307(1) (Reissue 1992). In 1985, Congress enacted 7 U.S.C. § 1631 (1994) as part of the federal Food Security Act (FSA). This federal act increased protection for third-party purchasers of farm products by reducing the potential of a secured party's enforcement of its interest against the purchaser, unless the secured party has properly recorded its interest in an "effective financing statement" filed separately from a U.C.C. filing, or the buyer has, within 1 year preceding the sale of the farm products, received from the seller or secured party of the secured interest in the farm products written notice, including specific information about the debtor, and a reasonable description of the farm products which are subject to the security interest. 7 U.S.C. § 1631(e)(1)(A). See, also, 3 James J. White & Robert S. Summers, Uniform Commercial Code, § 33-14 (4th ed. 1995). The Nebraska statutes which govern the "Nebraska Effective Financing Statement" form are found at Neb. Rev. Stat. § 52-1301 et seq. (Reissue 1993).

For a time prior to the passage of the FSA, Nebraska courts were reluctant to allow the defense of implied waiver where such waiver contravened the express written terms of an otherwise valid security agreement between a debtor and creditor. See, e.g., *Farmers State Bank v. Edison Non-Stock Coop. Assn.*, 190 Neb. 789, 212 N.W.2d 625 (1973); *Garden City Production Credit Assn. v. Lannan, supra.* Relying on Neb. U.C.C. § 1-205(4) (Reissue 1992), we held in *Edison Non-Stock Coop. Assn.* and *Lannan* that the express terms of an agreement between the parties controlled and superseded a course of dealing and usage of trade when such dealing or trade usage conflicted with the agreement's express terms, and the failure of the secured party to rebuke the debtor for sales of farm collateral without the express consent of the secured party did not, on the facts of those cases, constitute an implied waiver of a creditor's security interest.

Nebraska courts continuously remained open, however, to the presentation of evidence pertaining to a possible intentional waiver of a secured party's interest in pledged collateral and its proceeds. *Valentine Production Credit Assn. v. Spencer Foods, Inc.*, 196 Neb. 119, 241 N.W.2d 541 (1976). Recognizing continuing developments in the law and the practice of secured commercial transactions, we held in *Five Points Bank v. Scoular-Bishop Grain Co.*, 217 Neb. 677, 350 N.W.2d 549 (1984), and *State Bank v. Scoular-Bishop Grain Co.*, 217 Neb. 379, 349 N.W.2d 912 (1984), that a secured party's waiver of rights is a matter of fact which must be proved by clear and convincing evidence.

In Nebraska jurisprudence, the principal argument historically advanced to defeat the defense of a secured party's implied waiver of rights was based upon the language of the U.C.C. and, in particular, § 1-205(4). Section 1-205(4) provides generally that the express terms of an agreement shall be construed consistently with a course of dealing or usage of trade between the parties. However, when such a construction is unreasonable, the express terms of an agreement rather than usage are controlling. In *Farmers State Bank v. Farmland Foods*, 225 Neb. 1, 402 N.W.2d 277 (1987), we examined and contrasted § 1-205(4) with Neb. U.C.C. § 2-208(3) (Reissue

1992). Section 2-208(3) then provided in pertinent part, as it now does, that a "course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance." Consistent with our longstanding duty to give meaning to every portion of a statutory scheme wherever possible, see *Cox Cable of Omaha v. Nebraska Dept. of Revenue*, 254 Neb. 598, 578 N.W.2d 423 (1998), we concluded in *Farmland Foods* that § 1-205(4) is properly applied to the *preagreement* course of dealing between the parties, whereas § 2-208(3) has more relevant application to the parties' *postagreement* course of performance. On that basis, we found in *Farmland Foods* that a secured party's actions, including, inter alia, knowingly allowing the debtor to repeatedly sell secured collateral without preauthorization, failure to insist upon the remission of sale proceeds for application to the secured debt, and renewal of the debtors' promissory notes, constituted amendments to the parties' agreement which impliedly waived the creditor's right to enforce its security interest against a purchaser of the debtor's farm products. See, also, *Neu Cheese Co. v. Federal Deposit Ins. Corp.*, 825 F.2d 1270 (8th Cir. 1987); *Gretna State Bank v. Cornbelt Livestock Co.*, 236 Neb. 715, 463 N.W.2d 795 (1990).

In 1994, the Nebraska Legislature passed 1994 Neb. Laws, L.B. 974, which amended § 9-306. L.B. 974 was passed with an emergency clause. It became operative on April 19, 1994, and the statutory amendments contained in L.B. 974 are now codified at § 9-306(2). As amended, that section now provides as set forth below with the amendatory terms italicized as follows:

> Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor. *Authorization to sell, exchange, or otherwise dispose of farm products shall not be implied or otherwise result, nor shall a security interest in farm products be considered to be waived, modified, released, or terminated, from any course of conduct, course of performance,*

*or course of dealing between the parties or by any trade usage in any case in which: (a) The secured party has filed an effective financing statement in accordance with the provisions of sections 52-1301 to 52-1321, Reissue Revised Statutes of Nebraska, 1943, or (b) the buyer of farm products has received notice from the secured party or the seller of farm products in accordance with the provisions of 7 U.S.C. 1631(e)(1)(A), unless the buyer has secured a waiver or release of the security interest specified in such effective financing statement or notice from the secured party.*

(Emphasis supplied.)

Section 9-306 was amended again in 1995 and 1998. However, these subsequent amendments to § 9-306 do not impact the parties' claims in the case at bar, and we therefore do not discuss them here.

### 2. APPLICATION OF § 9-306(2) TO CASE AT BAR

Both BCSB and Haake moved for summary judgment before trial. In Haake's summary judgment motion, he alleged that the uncontroverted facts, including BCSB's actual knowledge of the Duhacheks' sale of milk from their cows without prior written authorization from BCSB and BCSB's allowance of the Duhacheks' application of the milk sales proceeds to other creditors, established BCSB's consent to the Duhacheks' acts and implied waiver of BCSB's security interest as a matter of law, before and after the amendment of § 9-306(2). The trial court denied Haake's summary judgment motion in its entirety.

In BCSB's summary judgment motion, relying on the amendment to § 9-306(2), it sought an order that as a matter of law, Haake should not be permitted to offer evidence that BCSB impliedly waived its security interest at any time after April 19, 1994. This claim, too, was overruled by the trial court, which found that there was a genuine issue of material fact for the jury's determination as to whether BCSB had at any point waived its security interest in the Duhacheks' milk and milk proceeds and, if so, the nature, scope, and duration of that waiver.

In our determination on appeal as to whether the trial court correctly applied § 9-306(2), before and after its amendment in

1994, to the facts of this case, we are guided by the presumption that the Legislature intended a sensible, rather than an absurd, result in enacting the statute and its amendments. *Veskerna v. City of West Point*, 254 Neb. 540, 578 N.W.2d 25 (1998). In construing a statute, we must look to the statute's purpose and give to the statute a reasonable construction which best achieves that purpose, rather than a construction which would defeat it. *Id.* Where the terms of a statute are plain and unambiguous, no interpretation is needed to ascertain their meaning and they are considered in their plain, ordinary, and popular sense. *Cox Cable of Omaha v. Nebraska Dept. of Revenue*, 254 Neb. 598, 578 N.W.2d 423 (1998). Further, when considering a series or collection of statutes pertaining to a certain subject matter which are in pari materia, they may be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions of the act are consistent and sensible. *Id.*

(a) Period Before April 19, 1994:
Should 1994 Amendments to § 9-306(2)
Be Applied Retroactively?

Noting that the 1994 amendments to § 9-306(2) tend to make establishing an implied waiver more difficult, BCSB claims on appeal that the trial court erred in its evidentiary rulings and in its instructions to the jury by declining to retroactively apply the 1994 amendments to § 9-306(2) to the period ending April 18, 1994, a period which predates the April 19, 1994, effective date of the amendments to § 9-306(2). We do not agree.

The payments made by the Duhacheks to Haake which BCSB claims were converted and which BCSB seeks to recover from Haake in this action were made on a monthly basis to Haake throughout the period of August 15, 1993, to December 15, 1994. In its pretrial summary judgment order and in the jury instructions, the trial court allocated the total sum received by Haake from the Duhacheks into two separate periods: August 15, 1993, through April 18, 1994, and April 19, 1994, the effective date of the amendments to § 9-306(2), through December 15, 1994.

BCSB claims that the trial court erred, inter alia, in failing to apply the 1994 amendments to § 9-306(2) to both periods of time before and after the amendments and, in particular, to the period from March 24, 1992, which was the date of the agreement between BCSB and the Duhacheks that all milk proceeds would be deposited by the Duhacheks at BCSB, to April 18, 1994. Haake asserted the defense of BCSB's implied waiver of its security interest during the time periods before and after the 1994 amendments, and the trial court allowed Haake to present evidence to the jury of BCSB's alleged waiver of its secured interest for both periods of time. BCSB claims on appeal that in allowing the jury to consider Haake's evidence of waiver for both periods, the trial court erroneously and prejudicially restricted the application of § 9-306(2), as amended. BCSB claims, in effect, that the 1994 amendments to § 9-306(2) should be applied retroactively to April 19 and that such application would result in no implied waiver of its security interest prior to April 19.

In Nebraska, in noncriminal cases, statutes are generally not given retroactive effect unless the Legislature has clearly expressed an intention that the new statute is to be applied retroactively. *Larson v. Jensen*, 228 Neb. 799, 424 N.W.2d 352 (1988). See, also, *Proctor v. Minnesota Mut. Fire & Cas.*, 248 Neb. 289, 534 N.W.2d 326 (1995). This is particularly so in the case of an amendment or change to substantive matters, as opposed to changes in procedural matters which may, in some cases, impact a pending action. *Denver Wood Products Co. v. Frye*, 202 Neb. 286, 275 N.W.2d 67 (1979); *Lindgren v. School Dist. of Bridgeport*, 170 Neb. 279, 102 N.W.2d 599 (1960). See, also, *Macku v. Drackett Products Co.*, 216 Neb. 176, 343 N.W.2d 58 (1984). In determining whether statutory amendments should be applied retroactively, we may look to the legislative history of the statute in general and in particular to the legislative intent, if any, regarding retroactivity. *Nickel v. Saline Cty. Sch. Dist. No. 163*, 251 Neb. 762, 559 N.W.2d 480 (1997).

According to the Statement of Intent accompanying L.B. 974, the legislative objective in the proposed amendment to § 9-306(2) was to provide that notwithstanding a secured

party's authorization of the sale, exchange, or other disposition of farm products, a creditor's security interest would not be considered waived, modified, released, or terminated if the creditor had filed the Nebraska Effective Financing Statement, in accordance with § 52-1301 et seq., or if the buyer of the secured farm products received " 'pre-notification' " of the secured party's interest in the farm products before purchase in accord with 7 U.S.C. § 1631(e)(1)(A). Statement of Intent, L.B. 974, Committee on Banking, Commerce, and Insurance, 93d Leg., 2d Sess. (Jan. 25, 1994).

The bill's introducer, Senator Doug Kristensen, stated that L.B. 974 was not intended to and did not alter the primary responsibility of secured parties to perfect their secured interests according to the U.C.C. as well as to properly execute an effective financing statement, and if secured parties failed to properly document and/or perfect their security interest, they would find no relief under § 9-306(2), as amended.

Senator Kristensen articulated several principles which the Legislature sought to effectuate with the passage of L.B. 974. These objectives included eliminating uncertainty regarding the status of secured interests in farm products at purchase, both for the buyer and the secured party, and emphasizing the continued duty of creditors to properly perfect their security interests according to Nebraska statutes.

L.B. 974 was debated at length in the Legislature's Committee on Banking, Commerce, and Insurance. There was considerable discussion by the legislators of past cases in which farm products purchasers had asserted the implied waiver of interest defense in the face of actions brought by secured creditors. The legislative history of L.B. 974 reveals, however, no indication of a legislative intent to make the amendments effective retroactively.

We observe that § 9-306(2) is but one section of the U.C.C., a series of statutes pertaining to commercial transactions which are in pari materia. Therefore, we conjunctively consider and construe these statutes so that different provisions of the act are consistent and sensible. See *Cox Cable of Omaha v. Nebraska Dept. of Revenue*, 254 Neb. 598, 578 N.W.2d 423 (1998).

Senator Kristensen aptly noted in legislative committee discussion that the provisions of the U.C.C. should not be interpreted and applied independently of each other. Decisions pertaining to § 9-306(2) have included consideration of other portions of the U.C.C., which of necessity, and by design, impact the § 9-306(2) determination and priority of interests in the disposition of collateral pledged as security for a debt. See, e.g., *Farmers State Bank v. Farmland Foods*, 225 Neb. 1, 402 N.W.2d 277 (1987) (contrasting § 1-205(4) with § 2-208(3), which addresses postagreement course of performance); *Five Points Bank v. Scoular-Bishop Grain Co.*, 217 Neb. 677, 350 N.W.2d 549 (1984); *State Bank v. Scoular-Bishop Grain Co.*, 217 Neb. 379, 349 N.W.2d 912 (1984) (discussing § 1-205(4) governing preagreement course of dealing).

In the instant case, neither the statutory language taken as a whole nor the legislative history of the amendments to § 9-306(2) presents a circumstance in which there is a need, or an intent, to deviate from Nebraska jurisprudence regarding the interdependent and comprehensive nature of the U.C.C., or the general rule that statutory amendments are not to be applied retroactively. We conclude that the 1994 amendments to § 9-306(2) are not to be applied retroactively. Thus, we find no error in the trial court's evidentiary rulings and jury instructions declining to apply the 1994 amendments to § 9-306(2) retroactive to the effective date of the amendments, April 19, 1994, thereby allowing the jury to consider the implied consent defense asserted by Haake for that period without reference to subsequent statutory amendments.

(b) Period From April 19 to December 15, 1994:
Application of § 9-306(2) to Facts

The first sentence of § 9-306(2), which was not changed by the 1994 amendments, provides that except where article 9 otherwise provides, a security interest continues in collateral and its identifiable proceeds, notwithstanding the sale, exchange, or other disposition of the collateral, "unless the disposition was authorized by the secured party in the security agreement *or otherwise*." (Emphasis supplied.) There being no evidence that BCSB specifically authorized the disposition of the Duhacheks'

goods or proceeds to Haake in the security agreement, the trial court correctly found that Haake's claim that BCSB impliedly waived its security interest in the milk proceeds fell within the "or otherwise" clause. See *Gretna State Bank v. Cornbelt Livestock Co.*, 236 Neb. 715, 463 N.W.2d 795 (1990).

The second sentence of the April 19, 1994, amendments to § 9-306(2) provides, inter alia, that authorization to sell, exchange, or otherwise dispose of farm products shall not be implied or otherwise result from any course of conduct, course of performance, or course of dealing between the parties or by any trade usage, nor shall a waiver of a security interest be implied in any case in which: (1) The secured party has filed an effective financing statement in accordance with § 52-1301 et seq. or (2) the buyer of the farm products has received notice from the secured party or seller of the products in accordance with 7 U.S.C. § 1631(e)(1)(A), unless the buyer has secured a waiver or release of the security interest specified in the effective financing statement or notice received from the secured party.

As noted above, an effective financing statement created pursuant to § 52-1301 et seq. represents a separate statement in addition to the security interests referenced generally in the U.C.C. The effective financing statement statutory scheme arose as a result of the passage of the FSA. See *Battle Creek State Bank v. Preusker*, 253 Neb. 502, 571 N.W.2d 294 (1997). An effective financing statement pertains to rights between a seller of collateral in which a security interest has been asserted and a buyer of farm products in the ordinary course of business. An effective financing statement does not govern the rights of a third party such as Haake, who is not a buyer of farm products in the ordinary course of business. See *id.*

In the instant case, BCSB filed effective financing statements in Madison and Holt Counties describing BCSB's security interest in property owned by the Duhacheks. These effective financing statements are relevant merely to Haake's defense of waiver. Brestel testified that at all times during BCSB's lending relationship with the Duhacheks from 1986 through 1994, BCSB knew that the Duhacheks were engaged in dairy production which entailed the sale of milk on an ongoing basis. The

effective financing statement forms filed by BCSB contained spaces and terms which expressly provided for possible security interests in numerous products, including milk and the proceeds therefrom, which the preparer must check off to properly identify the products covered by the effective financing statement. In its effective financing statements, BCSB specifically claimed a security interest in Duhacheks' corn, soybeans, hay, hogs, and cattle and calves. BCSB did not claim a security interest in Duhacheks' milk and milk proceeds in either of the effective financing statements it filed relative to its economic relationship with the Duhacheks. Although the failure of BCSB to list the Duhacheks' milk and the proceeds therefrom in its effective financing statements is relevant evidence of Haake's defense that BCSB waived its security interest in the milk and the milk proceeds, because Haake is not a buyer of farm products in the ordinary course of business, BCSB's failure to list milk, standing alone, is not a waiver of BCSB's security interest as against Haake. See *Preusker, supra.*

The second provision set forth in § 9-306(2) pursuant to which a defense of implied waiver might be defeated applies to secured parties or sellers who provide buyers of farm products in the ordinary course of business with disclosure of the claimed security interest as prescribed by 7 U.S.C. § 1631(e)(1)(A). That federal statute provides that buyers of farm products are subject to a preexisting security interest in collateral created by the seller if, within 1 year preceding the sale of the farm products, the buyer receives written notice of the security interest from the seller or secured party and that notice contains the name and address of the debtor and the secured party, the Social Security number or federal tax identification number of the debtor, and a description of the farm products subject to the security interest.

Brestel testified that he provided Northeast Nebraska Milk Producers Co-op, which purchased the milk produced by the Duhacheks' cows, with a photocopy of at least one of BCSB's filings made to perfect its security interest under the U.C.C. There is no evidence, however, that BCSB ever provided Haake with information regarding BCSB's security interest in the Duhacheks' milk and milk proceeds. More importantly, Haake

was not a "buyer" of farm products in the ordinary course of business with the Duhacheks because Haake sold dairy cows to the Duhacheks, but he purchased nothing from them. It is clear that Haake was not within the class of purchasers of farm products in the ordinary course of business who are restricted from asserting the implied consent or waiver of security interest due to proper notice of another's interest provided for in § 9-306(2), as amended. See *Battle Creek State Bank v. Preusker*, 253 Neb. 502, 571 N.W.2d 294 (1997).

Section 9-306(2) contains no other specific limitations upon the assertion of the claim that a secured party impliedly waived its security interest, and we decline to add any further limitations. We are guided by the well-established principle expressio unius est exclusio alterius, that is, the expression of one thing is the exclusion of another. *PLPSO v. Papillion/LaVista School Dist.*, 252 Neb. 308, 562 N.W.2d 335 (1997). Had the Legislature intended to further expand the circumstances in which the defense of implied waiver was foreclosed from a litigant as a matter of law, the terms of § 9-306(2) would so reflect. They do not.

Whether requested to do so or not, a trial court has the duty to instruct the jury on issues presented by the pleadings and evidence. *State v. Yeutter*, 252 Neb. 857, 566 N.W.2d 387 (1997). Furthermore, the trial court need not instruct the jury where the facts do not justify the instruction. See *State v. Marshall*, 253 Neb. 676, 573 N.W.2d 406 (1998), relying on *State v. Allison*, 238 Neb. 142, 469 N.W.2d 360 (1991). In the instant case, the trial court instructed the jury as to the existence of the amended provisions of § 9-306(2) for the period after April 19, 1994, to which the provisions apply. It did not further elaborate on the application of the amendments to § 9-306(2) regarding effective financing statements or presale notification, as the evidence did not support such instructions. We find no error in the trial court's evidentiary rulings, in its refusal to apply the amendments to § 9-306(2) retroactively, or in its jury instructions allowing Haake to introduce evidence of his claim that BCSB waived its security interest in the proceeds of the Duhacheks' sale of milk during 1993 and 1994, before and after the amendments to § 9-306(2) took effect.

## V. CONCLUSION

It has long been the rule that a party who seeks to assert that a secured creditor has impliedly waived its security interest in farm products bears the burden of proving such a waiver by clear and convincing evidence. *Five Points Bank v. Scoular-Bishop Grain Co.*, 217 Neb. 677, 350 N.W.2d 549 (1984). Haake did so to the jury's satisfaction in the case at bar as to the period both before and after the 1994 amendments to § 9-306(2). We conclude that the 1994 amendments to § 9-306(2) are not to be retroactively applied. We further conclude that based on the facts of this case, in general, there was no error in the trial court's rulings and instructions to the jury and, in particular, in its refusal to apply the 1994 amendments to § 9-306(2) retroactively. Because the facts did not justify such specific instructions, the trial court properly declined to instruct the jury on the application of the amendments to § 9-306(2) with respect, inter alia, to the effective financing statements and presale notification. The trial court's rulings and the jury's verdict in favor of Haake are, therefore, affirmed.

AFFIRMED.